**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KAITY RUILOVA and EILEEN BRANNIGAN, Individually and as representatives of a class of similarly situated persons, on behalf of the YALE-NEW HAVEN HOSPITAL AND TAX EXEMPT AFFILIATES TAX SHELTERED ANNUITY PLAN,<br><br>          Plaintiffs,<br>  v.<br><br>YALE-NEW HAVEN HOSPITAL, INC.; THE BOARD OF TRUSTEES OF YALE-NEW HAVEN HOSPITAL, INC.; THE SYSTEM INVESTMENT COMMITTEE OF YALE NEW HAVEN HEALTH SERVICE CORP. AND SYSTEM AFFILIATES, THE RETIREMENT COMMITTEE OF YALE NEW HAVEN HEALTH SERVICES CORP. AND SYSTEM AFFILLIATES; and DOES No. 1-20, Whose Names Are Currently Unknown,<br><br>          Defendants. | Case No: 3:22-cv-00111-MPS<br><br>**AMENDED CLASS ACTION COMPLAINT** |

## I.   INTRODUCTION

1.      Plaintiffs, Kaity Ruilova ("Ruilova") and Eileen Brannigan ("Brannigan") (collectively, "Plaintiffs"), individually in their capacity as former participants of the Yale-New Haven Hospital and Tax Exempt Affiliates Tax Sheltered Annuity Plan ("Plan"), bring this action under 29 U.S.C. § 1132, on behalf of the Plan and a class of similarly-situated participants and beneficiaries of the Plan, against Defendants, Yale-New Haven Hospital, Inc. ("Yale-NH Hospital"), the Board of Trustees of Yale-New Haven Hospital, Inc. ("Board"), the System Investment Committee of Yale New Haven Health Services Corp. and System Affiliates, the Retirement Committee of Yale New Haven Health Services Corp. and System Affiliates,

(together "Administrative Committees" or "Committees"), and Does No. 1-20, who are members of the Administrative Committees or the Board or other fiduciaries of the Plan and whose names are currently unknown (collectively, "Defendants"), for breach of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*., and related breaches of applicable law beginning six years prior to the date this action was initially filed and continuing to the date of judgment, or such earlier date that the Court determines is appropriate and just (the "Class Period").[1]

2.      Defined contribution plans (*e.g.*, 401(k) and 403(b) plans) that are qualified as tax-deferred vehicles have become the primary form of retirement saving in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or underperformance of pension plan assets used to fund defined benefits, the participants in 401(k) and 403(b) plans bear the risk of high fees and investment underperformance.

3.      The importance of defined contribution plans to the United States retirement system has become pronounced as employer-provided defined benefit plans have become increasingly rare as an offered and meaningful employee benefit.

4.      As of December 31, 2020, the Plan had 26,416 participants with account balances and assets totaling approximately $1.66 billion, placing it in the top 0.1% of all defined contribution plans by plan size.[2]  Defined contribution plans with substantial assets, like the

---

[1]Plaintiffs file this Amended Class Action Complaint pursuant to the Court's April 29, 2022 order directing Plaintiffs to file a response to Defendants' motion to dismiss or an amended complaint (ECF No. 46).  Attached as Exhibit "A" hereto is a redline copy of this Amended Class Action Complaint indicating the changes made to the Class Action Complaint filed on January 1, 2022 (ECF No. 1).

[2]The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 (pub. July 2021).

Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for administration of defined contribution plans and the investment of defined contribution assets. The marketplace for defined contribution retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

5. Defendants maintain the Plan, and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services. Defendants are fiduciaries under ERISA, and, as such, owe a series of duties to the Plan and its participants and beneficiaries, including obligations to act for the exclusive benefit of participants, ensure that the investment options offered through the Plan are prudent and diverse, and ensure that Plan expenses are fair and reasonable.

6. Defendants have breached their fiduciary duties to the Plan. As detailed below, Defendants: (1) failed to fully disclose the expenses and risk of the Plan's investment options to participants; (2) allowed unreasonable expenses to be charged to participants; and (3) selected, retained, and/or otherwise ratified high-cost and poorly-performing investments instead of offering more prudent alternative investments that were readily available at the time Defendants selected and retained the funds at issue and throughout the Class Period.

7. To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this class action under Sections 404, 409 and 502 of ERISA, 29 U.S.C. §§ 1104, 1109 and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan and the proposed class ("Class") as the Court may deem appropriate and just under the circumstances.

8. Plaintiffs specifically seek the following relief on behalf of the Plan and the Class:

a.      A declaratory judgment holding that the acts of Defendants described

herein violate ERISA and applicable law;

b.      A permanent injunction against Defendants prohibiting the practices

described herein and affirmatively requiring them to act in the best

interests of the Plan and its participants;

c.      Equitable, legal or remedial relief for all losses and/or compensatory

damages;

d.      Attorneys' fees, costs and other recoverable expenses of litigation; and

e.      Such other and additional legal or equitable relief that the Court deems

appropriate and just under all of the circumstances.

## II.      THE PARTIES

9.      Ruilova is a former employee of Yale-NH Hospital and former participant in the

Plan under 29 U.S.C. § 1002(7).  Ruilova is a resident of Stratford, Connecticut.  During the

Class Period, Ruilova maintained an investment through the Plan in the Fidelity Freedom 2050

Fund and was subject to the excessive recordkeeping and administrative costs alleged below.

10.     Brannigan is a former employee of Yale-NH Hospital and former participant in

the Plan under 29 U.S.C. § 1002(7).  Brannigan is a resident of New Haven, Connecticut.

During the Class Period, Brannigan maintained an investment through the Plan investing in the

Fidelity Freedom 2020 Fund, Fidelity Advisor Freedom 2025 Fund, and the Fidelity Government

Money Market Fund and was subject to the excessive recordkeeping and administrative costs

alleged below.

11.     Yale-NH Hospital is a Connecticut nonprofit corporation headquartered in New

Haven, Connecticut.  Yale-NH Hospital, the flagship hospital of the Yale-New Haven Health

System, is the largest acute-care provider in southern Connecticut and one of the Northeast's

major referral centers, as well as the primary teaching hospital for the Yale School of Medicine.

12.     The Board appointed "authorized representatives" of Yale-NH Hospital, including

the Administrative Committees, as plan fiduciaries.  Does No. 1-10 are members of the Board

who were/are fiduciaries of the Plan under ERISA pursuant to 29 U.S.C. §§ 1002(21)(A)

because each exercised discretionary authority to appoint and/or monitor the Administrative

Committees, which had control over Plan management and/or authority or control over

management or disposition of Plan assets.

13.     The Administrative Committees are the Plan Administrators and are fiduciaries

under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.  The Administrative Committees

maintain their addresses at Yale-NH Hospital's corporate headquarters in New Haven,

Connecticut.  The Administrative Committees and their members are appointed by Yale-NH

Hospital or its delegate to administer the Plan on Yale-NH Hospital's behalf.

14.     Does No. 11-20 are the members of the Administrative Committees and, by virtue

of their membership, fiduciaries of the Plan or otherwise are fiduciaries to the Plan.  Plaintiffs are

currently unable to determine the membership of the Administrative Committees or the identities

of the other fiduciaries of the Plan because, despite reasonable and diligent efforts, it appears that

the membership of the Administrative Committees and the identities of any other fiduciaries are

not publicly available.  As such, these Defendants are named Does as placeholders.  Plaintiffs

will move, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to amend this Complaint

to name the members of the Administrative Committees, the members of the Board, and other

responsible individuals as defendants as soon as their identities are discovered.

### III.   JURISDICTION AND VENUE

15.     Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

17.      Venue is proper in this District pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because Yale-NH Hospital's principal place of business is in this District and the Plan is administered from this judicial district.  Furthermore, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

18.     Plaintiffs have standing to bring this action.  Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan.  As explained herein, the Plan has suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by this Court.  In addition, although standing under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiffs and all Plan participants suffered financial harm as a result of the Plan's imprudent investment options and excessive fees, and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

### IV.   FACTUAL ALLEGATIONS

**A.   Background and Plan Structure**

19.     The Plan is a participant-directed 403(b) plan, meaning participants direct the investment of their contributions into various investment options offered by the Plan.  Each

participant's account is credited with the participant contributions, employer matching contributions, any discretionary contributions, and earnings or losses thereon.  The Plan pays Plan expenses from Plan assets, and the majority of administrative expenses are paid by participants as a reduction of investment income.  Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses.  The available investment options for participants of the Plan include various mutual funds, a guaranteed investment contract, and a self-directed brokerage account.

20.     Mutual funds are publicly traded investment vehicles consisting of a pool of monetary contributions collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the U.S. Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation and are required to provide certain investment and financial disclosures and information in the form of a prospectus.

21.     Guaranteed investment contracts are insurance company contracts that guarantee a rate of return in exchange for keeping a deposit for a certain period of time.  Contributions are held in the general account of the issuing insurance company and are credited with earnings on the underlying investments and charged for withdrawals and administrative costs.  The guaranteed return of principal, plus the contractually obligated interest rate, is subject to the long-term financial health and claims-paying ability of the issuing company.

22.     During the Class Period, Plan assets were held in a trust by the Plan trustee, Fidelity Management Trust Company.  All investments and asset allocations are performed through this trust instrument.

**B.**     **The Defined Contribution Industry**

23.     When ERISA fiduciaries fail to monitor fees and costs for reasonableness, there are stark financial consequences for retirees.  Every extra level of expenses imposed upon plan participants compounds over time and reduces the value of participants' investments available upon retirement.  Over time, even small differences in fees compound and can result in vast differences in the amount of a participant's savings available at retirement.  As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015).

24.     The impact of excessive fees on employees' and retirees' retirement assets is dramatic.  The U.S. Department of Labor ("DOL") has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career.[3]

25.     Plan participants typically have little appreciation of the fees being assessed to their accounts.  Indeed, according to a 2017 survey conducted by TD Ameritrade, only 27% of investors believed they knew how much they were paying in fees as participants in defined contribution plans, and 37% were unaware that they paid defined contribution fees at all.[4]  It is incumbent upon plan fiduciaries to act for the exclusive best interest of plan participants, protect their retirement dollars, and ensure that fees are and remain reasonable for the services provided and are properly and fully disclosed.  Unfortunately, fiduciaries of defined contribution

---

[3]*A Look at 401(k) Plan Fees*, U.S. DEPT. OF LAB. 1-2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/a-look-at-401k-plan-fees.pdf.

[4]*See Investor Pulse Survey*, TD AMERITRADE (Jan. 2018), https://s2.q4cdn.com/437609071/files/doc_news/research/2018/Investor-Sentiment-Infographic-401k-fees.pdf.

retirement plans, including large retirement plans like the Plan, also often lack understanding of the fees being charged to the plans that they administer, manage, and control.

**C.     Recordkeeping and Administrative Services**

26.     Fiduciaries of virtually all large defined contribution plans, including the Plan, hire a single provider for the essential recordkeeping and administrative ("RK&A") services for the plan.  These services include, but are not limited to, maintaining plan records, tracking participant account balances and investment elections, providing transaction processing, providing call center support and investment education and guidance, providing participant communications, and providing trust and custodial services.

27.     The term "recordkeeping" is a catchall term for the entire suite of recordkeeping and administrative services typically provided by a plan's service provider or "recordkeeper."  In other words, recordkeeping fees and RK&A fees are one and the same and the terms are used synonymously.

28.     Recordkeepers typically collect their fees in two forms, respectively referred to as "direct" compensation and "indirect" compensation.

29.     Direct compensation is paid directly from plan assets and reflected as a deduction in the value of participant accounts.

30.     Indirect Compensation is paid to the recordkeeper indirectly by third parties and is not transparent to retirement plan participants.  In other words, the fees are taken from the investment options before the value of the investment option is provided to the participant.  Thus, in most cases, participants are not aware they are paying these fees.  Most indirect compensation is typically collected by recordkeepers through asset-based "revenue sharing."

31.     Virtually all recordkeepers are subsidiaries or affiliates of financial services and insurance companies that also provide investment options to defined contribution plans, (*e.g.*, mutual funds, insurance products, collective trusts, separate accounts, *etc.*), or have some other ancillary line of business (*e.g.*, consulting) to sell to plans.  As a result, all recordkeepers consider the economic benefit of their entire relationship with a defined contribution plan when setting fees for the RK&A services.  Simply put, discounts in the RK&A fee rate are often available based on revenues the recordkeeper earns through the provision of other services (*e.g.*, investment management revenues).  In many cases, the additional investment management revenues are more than double or triple the revenue earned by the recordkeeper for providing RK&A services.

32.     There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan).  First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" arrangement for a buffet style level of service, meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis).  These services include, but are not limited to, the following:

  i.   Recordkeeping;

  ii.  Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

  iii. Administrative services related to converting a plan from one recordkeeper to another;

    iv.   Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

    v.   Maintenance of an employer stock fund (if needed);

    vi.   Plan document services, including updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

    vii.   Plan consulting services, including assistance in selecting the investment lineup offered to participants;

    viii.   Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[5] (excluding any separate fees charged by an independent third-party auditor);

    ix.   Compliance support, including assistance interpreting plan provisions and ensuring plan operation complies with legal requirements and plan provisions (excluding separate legal services provided by a third-party law firm); and

    x.   Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

33.    This suite of essential RK&A services can be referred to as "Bundled RK&A" services. These services are offered by all recordkeepers for one price (typically at a *per capita* rate), regardless of the services chosen or utilized by the plan. Anyone who has passing

---

[5]The Form 5500 is the annual report that defined contribution plans are required to file with the DOL and U.S. Department of Treasury pursuant to ERISA reporting requirements.

familiarity with recordkeepers' responses to requests for proposals, their bids and their contracts understands and appreciates that the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services; any claim that recordkeeping expenses depend upon the service level provided to a plan is both false and frivolous. Nonetheless, fiduciary-defendants all too often attempt to stave off breach of fiduciary duty claims by disingenuously asserting that the cost of Bundled RK&A services depends upon service level, even though such an assertion is plainly untrue based upon the actual marketplace for such services.

34.     The second type of essential RK&A services provided by all national recordkeepers, "A La Carte RK&A" services, often have separate, additional fees based on the conduct and use of individual participants.  These fees are distinct from the Bundled RK&A arrangement to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance.  These A La Carte RK&A services typically include, but are not limited to, the following:

  i.   Loan processing;

  ii.   Brokerage services/account maintenance (if offered by the plan);

  iii.   Distribution services; and

  iv.   Processing of qualified domestic relations orders.

35.     All national recordkeepers have the capability to provide all the aforementioned RK&A services to large defined contribution plans, including those much smaller than the Plan.

36.     For large plans with more than 5,000 participants, any minor variations in the way these essential RK&A services are delivered have no material impact on the fees charged by recordkeepers to deliver the services. Indeed, the industry-wide practice of recordkeepers

quoting fees for Bundled RK&A services on a per-participant basis without regard for any individual differences in services requested confirms that recordkeepers view such differences as immaterial and inconsequential from a cost perspective.

37.     While recordkeepers in the defined contribution industry attempt to distinguish themselves through marketing and other means, they all offer the same bundles and combinations of services.  Accordingly, the market for defined contribution plan RK&A services has become increasingly price competitive, particularly for larger plans, like the Plan, that have a considerable number of participants and significant assets.

38.     The marginal cost of adding an additional participant to a recordkeeping platform is relatively low.  These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans, including the Plan.  As a plan's participant count increases, the recordkeeper's fixed costs of providing RK&A services are spread over a larger population, thereby reducing the average unit cost of delivering services on a per-participant basis.

39.     Due to these economies of scale inherent in the recordkeeping relationship, and because the incremental variable costs for providing RK&A depend on the number of participants with account balances in a defined contribution plan, the cost to the recordkeeper on a per-participant basis declines as the number of plan participants increases and, as a result, a recordkeeper will accept a lower fee to provide RK&A as the number of participants in the plan increases.

40.     As a result, it is axiomatic in the retirement plan services industry that, all else being equal: (1) a plan with more participants can and will receive a lower effective per-participant fee when evaluated on a per-participant basis; and (2) as participant counts increase,

the effective per-participant RK&A fee should decrease, assuming the same services are provided.

41.     Similarly, the average cost for a recordkeeper to provide services to a participant does not hinge on that participant's account balance.  In other words, it costs a recordkeeper the same amount to provide services to a participant with an account balance of $10,000 as it does to provide services to a participant with a balance of $1,000,000.

42.     Informed, prudent plan fiduciaries are aware of these cost structure dynamics and marketplace realities and will leverage the plan's participant count to obtain lower effective per-participant fees.

43.     Because recordkeeping fees are paid in dollars, prudent fiduciaries evaluate the fees for RK&A services on a dollar-per-participant basis.  This is the current standard of care for ERISA fiduciaries and has been throughout the Class Period.

44.     Prudent fiduciaries will regularly ensure that a plan is paying fees commensurate with its size in the marketplace by soliciting competitive bids from recordkeepers other than the plan's current provider.  Recognizing that RK&A services are essentially uniform in nature, and that small differences in the services required by a large plan are immaterial to the cost of providing such services, most recordkeepers only require a plan's participant count and asset level in order to provide a fee quote.  These quotes are typically provided on a per-participant basis, enabling fiduciaries to easily compare quotes on an apples-to-apples basis to determine if the current level of fees being charged by a plan's recordkeeper is reasonable.

45.     Having received quotes, a prudent fiduciary can then negotiate with the plan's current provider for a lower fee or move to a new provider for the same (or better) services at a

competitive (or lower) fee.  This is because prudent fiduciaries understand that excessive fees significantly and detrimentally impact the value of participants' retirement accounts.

46.     After negotiating the fee the plan will pay to the recordkeeper, the fiduciaries can allocate the fee among participant accounts at the negotiated per-participant rate or *pro rata* based on participant account balances or use a different, less common method.

**D.     Defendants' Breaches of Fiduciary Duties**

47.     As discussed in detail below, Defendants have severely breached their fiduciary duties of prudence and loyalty to the Plan in several significant ways.  Plaintiffs did not acquire actual knowledge regarding Defendants' breaches at issue here until shortly before the original Complaint was filed.

**1.     The Plan's Excessive Recordkeeping/Administrative Costs**

48.     An obvious indicator of Defendants' breaches of their fiduciary duties is the Plan's excessive RK&A costs.  The impact of such high fees on participant balances is aggravated by the effect of compounding, to the significant detriment of participants over time. This effect is illustrated by the below chart, published by the SEC, showing the 20-year impact on a balance of $100,000 by fees of 25 basis points (0.25%), 50 basis points (0.50%), and 100 basis points (1.00%).



49.     During the Class Period, participants paid Fidelity for RK&A services indirectly through asset-based revenue sharing.  The RK&A services provided to the Plan are and were the same standard services identified above, and are and were the same as those provided to comparable plans.  Fidelity provides no services to the Plan and its participants that are unusual or out of the ordinary.  Regardless, for large plans like the Plan, any differences in services are immaterial to pricing considerations, the primary drivers of which are the number of participants and whether the plan fiduciaries employed a competitive process of soliciting bids to determine the reasonable market rate for the services required by the plan.

50.     Since the start of the Class Period, Defendants allowed the Plan to be charged total amounts of RK&A fees that far exceeded the reasonable market rate.  The table below sets forth the annual per participant amounts the Plan ultimately paid to Fidelity in RK&A fees, per the Plan's Form 5500s.

|  | 2016 | 2017 | 2018 | 2019 | 2020 | Average |
|---|---|---|---|---|---|---|
| Participant Accounts with a Balance | 15,388 | 19,447 | 20,513 | 21,950 | 26,416 | 20,743 |
| Indirect Compensation | $1,781,883 | $1,700,588 | $1,654,185 | $2,073,950 | $ 2,449,558 | $1,932,033 |
| Administrative Credit to Plan | $ (811,836) | $ (815,913) | $ (891,851) | $ (960,084) | $(1,247,126) | $ (945,362) |
| Fidelity RK&A Fee ($) | $ 970,047 | $ 884,675 | $ 762,334 | $1,113,866 | $ 1,202,432 | $ 986,671 |
| Fidelity RK&A Fee ($/pp) | $63 | $45 | $37 | $51 | $46 | $48 |

51.     Given the Plan's size, expected growth, and resulting negotiating power, with prudent management and administration, the Plan should unquestionably have been able to obtain reasonable rates for RK&A services that were significantly lower than the effective per-participant RK&A rates set forth above.

52.     According to publicly available data and information from the Form 5500 filings of similarly sized defined contribution plans during the Class Period, other comparable plans were paying much lower fees than the Plan throughout the Class Period.  That is clear and compelling evidence that the reasonable market rate is lower than what the Plan was paying since these comparable plans were able to negotiate lower fees for materially identical services.

53.     The table below lists the RK&A fees paid by similarly sized defined contribution plans, which represent the prices available to the Plan during the Class Period.  Some of these plans used Fidelity as their recordkeeper, while others used different high-quality, national recordkeepers.  The table also indicates the number of participants and assets of each plan.

| Plan | Participants | RK&A Fee ($) | RK&A Fee ($/pp) | Recordkeeper |
|------|-------------|-------------|----------------|-------------|
| Viacom 401(k) Plan | 12,884 | $  411,959 | $32 | Great West |
| Michelin 401(k) Savings Plan | 15,880 | $  543,332 | $34 | Vanguard |
| Ecolab Savings Plan and ESOP | 17,886 | $  608,061 | $34 | Fidelity |
| Fedex Office and Print Services, Inc. 401(k) Retirement Savings Plan | 19,354 | $  444,784 | $23 | Vanguard |
| **Yale-New Haven Hospital and Tax-Exempt Affiliates Tax Sheltered Annuity Plan Average Fee** | **20,743** | **$  986,671** | **$48** | **Fidelity** |
| Qualcomm Incorporated Employee Savings and Retirement Plan | 20,955 | $  639,143 | $31 | Fidelity |
| The Rite Aid 401(k) Plan | 24,309 | $  719,730 | $30 | Great West |
| Sanofi U.S. Group Savings Plan | 25,086 | $  567,836 | $23 | T. Rowe Price |
| Philips North America 401(k) Plan | 28,348 | $  720,606 | $23 | Prudential |
| Orlando Health, Inc. Retirement Savings Plan 403B | 29,229 | $  870,097 | $30 | Fidelity |

54.     The RK&A fees calculated[6] for each similar comparable plan in the table above include all the direct and indirect compensation paid to the recordkeeper disclosed on each plan's

_____

[6]Fee calculations for the comparable plans are based on the information disclosed in each plan's 2020 Form 5500, or

Form 5500, accounting for Bundled and any A La Carte services.  Specifically, if the pricing structure as described in the Form 5500 reveals that some or all revenue sharing is not returned to the plan, then the appropriate amount of revenue sharing is also included to calculate the RK&A fees.  In some cases, the plan's investment options do not contain revenue sharing and, as a result, any indirect revenue is immaterial to the RK&A fees.  In other plans, all of the revenue sharing is returned to the plans and is therefore not included in the fee calculation.

55.     The comparable plans above received at least the same RK&A services received by the Plan.  Therefore, the fees in the table above are apples-to-apples comparisons in that they include all the fees being charged by each recordkeeper to provide the same RK&A services to similar defined contribution plans.

56.     As the table above indicates, the fees paid by the Plan for virtually the same package of services are much higher than those of plans with comparable, and in many cases smaller, participant counts.  Indeed, based on fees paid by other large plans during the Class Period receiving materially identical RK&A services, it is more than reasonable to infer that Defendants failed to follow a prudent process to ensure that the Plan was paying only reasonable fees.  In light of the amounts remitted to Fidelity throughout the Class Period, Defendants clearly engaged in virtually no examination, comparison, or benchmarking of the RK&A fees of the Plan to those of other similarly sized defined contribution plans, or they were complicit in paying grossly excessive fees.

57.     Defendants' failure to recognize that the Plan and its participants were grossly overcharged for RK&A services and their failure to take effective remedial actions amounts to a shocking breach of their fiduciary duties to the Plan.  To the extent Defendants had a process in

the most recently filed Form 5500 if 2020 is not available.

place, it was imprudent and ineffective given the objectively unreasonable fees the Plan paid for

RK&A services.  Had Defendants appropriately monitored the compensation paid to Fidelity and

ensured that participants were only charged reasonable RK&A fees, Plan participants would not

have lost millions of dollars in their retirement savings over the last six-plus years.

### 2.     The Plan's Investment in the Fidelity Freedom Funds

58.     Among other investments, the Plan lineup offers a suite of 14 target date funds

("TDF(s)").  A TDF is an investment vehicle that offers an all-in-one retirement solution through

a portfolio of underlying funds that gradually shifts to become more conservative as the assumed

target retirement year approaches.  TDFs offer investors dynamic, easy asset allocation, while

providing both long-term growth and capital preservation.  All TDFs are inherently actively

managed, because managers make changes to the allocations to stocks, bonds, and cash over

time.  These allocation shifts are referred to as a fund's glide path.  The underlying mutual funds

that TDF managers choose to represent each asset class can be actively or passively managed.

59.     According to the Plan's Form 5500s, since at least December 31, 2009,[7] the Plan

has offered the Fidelity Freedom funds target date suite.  Fidelity Management & Research

Company ("Fidelity") is the second largest TDF provider by total assets.  Among its several

target date offerings, Fidelity offers the riskier and more costly Freedom funds (the "Active

suite") and the substantially less costly and less risky Freedom Index funds (the "Index suite").

Defendants were responsible for crafting the Plan lineup and could have chosen any of the target

date families offered by Fidelity, or those of any other target date provider.  Defendants should

have considered the respective merits and features of all available TDF options, but they failed to

---

[7]The Form 5500 provides a detailed schedule of the Plan's holdings at the end of each calendar year. The suite of Fidelity Freedom funds appears as a Plan investment option as far back as the 2009 Form 5500, the earliest publicly available filing.

compare the Active and Index suites, as well as all other available TDFs (including actively managed TDFs).

60.     A simple weighing of the benefits of all other available TDFs at the beginning of the Class Period would have raised a significant red flag for prudent fiduciaries and indicated that the Active suite was not a suitable and prudent option for the Plan.  In addition, any objective evaluation of the Active suite would have resulted in the selection of a more consistent, better performing, and more appropriate TDF than the Active suite.  Had Defendants carried out their responsibilities in a single-minded manner with an eye focused solely on the interests of the participants, they would have come to this conclusion and acted upon it.  Instead, Defendants failed to act in the sole interest of Plan participants and breached their fiduciary duty by imprudently selecting and retaining the Active suite.

61.     The two fund families (*i.e.*, the Active suite and the Index suite) have nearly identical names and share a management team.[8]  But while the Active suite invests predominantly in actively managed Fidelity mutual funds,[9] the Index suite places no assets under active management, electing instead to invest in Fidelity funds that simply track market indices. The Active suite is also dramatically more expensive than the Index suite, and riskier in both its underlying holdings and its asset allocation strategy.  Defendants' decision to add the Active suite over another prudent TDF suite, and their failure to replace the Active suite at any point during the Class Period, constitutes a glaring breach of their fiduciary duties.[10]

---

[8]Both target date suites have been managed by Brett Sumsion and Andrew Dierdorf since 2014.  Finola McGuire Foley was added to the Index suite team in 2018.

[9]Per Morningstar, the Active suite's underlying holdings are 88.8% actively managed, by asset weight.

[10]While the Active suite has enjoyed some positive recent returns, such performance does not absolve Defendants of their breaches throughout the Class Period.  Indeed, the managers of the Active suite made certain tactical shifts in the funds' asset allocation in or about 2020 that yielded positive returns in the high-volatility environment in 2020 and 2021, effectively undertaking a further strategy change and rendering the Active suite's recent performance less than meaningful in assessing the prudence of maintaining the Active suite in the Plan during the Class Period.  The

62.     Exacerbating Defendants' imprudent choice to add and retain the Active suite is its designation as the Plan's Qualified Default Investment Alternative ("QDIA").  Under DOL regulations, retirement plan fiduciaries can select one of the investment offerings in a plan's lineup as a QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets.  If participants do not indicate where their assets should be invested, all contributions are automatically invested in the QDIA.  Plan fiduciaries are responsible for the prudent selection and monitoring of an appropriate QDIA.  The Fidelity Freedom fund with the target year closest to a participant's assumed retirement age (*i.e.*, age 65) serves as the QDIA in the Plan.

63.     Given that the vast majority of Plan participants are not sophisticated investors, many, by default, concentrate their retirement assets in TDFs.  As such, the impact of Defendants' imprudent selection of TDFs is magnified vis-à-vis other asset categories.  Indeed, by December 31, 2020, approximately 56% of the Plan's assets were invested in the Active suite.

         i.     The Active Suite is High-Risk and Unsuitable for Plan Participants

64.     The Active suite chases returns by taking levels of risk that render it unsuitable for the average retirement investor, including participants in the Plan.  At first glance, the equity glide paths of the Active suite and Index suite appear nearly identical, which would suggest both target date options have a similar risk profile.  However, the Active suite subjects its assets to significantly more risk than the Index suite, through multiple avenues.  At the underlying fund level, where the Index suite invests only in index funds that track segments of the market, the

---

fact that the changes in the Active suite produced more positive returns (as additional risk was undertaken) over a short period of time does not exonerate Defendants.  To hold otherwise would require a hindsight analysis not permitted under controlling precedent.

Active suite primarily features funds with a manager deciding which securities to buy and sell, and in what quantities.

65.     The goal of an active manager is to beat a benchmark—usually a market index or combination of indices—by taking on additional risk.  Market research has indicated that investors should be very skeptical of an actively managed fund's ability to consistently outperform its index, which is a significant concern for long-term investors saving for retirement, like the Plan participants.  Actively managed funds tend to charge higher fees than index funds, which are passed on to the TDF investor through higher expense ratios.  These extra costs present an additional hurdle active managers must clear in order to provide value and compensate investors for the added risk resulting from their decision-making.  Indeed, Morningstar has repeatedly concluded that "in general, actively managed funds have failed to survive and beat their benchmarks, especially over longer time horizons."[11]  Although they may experience success over shorter periods, active fund managers are rarely able to time their activity efficiently and frequently enough to outperform the market.  The Active suite's allocation to primarily actively managed funds thus subjects investor dollars to the decision-making skill and success, or lack thereof, of the underlying managers and the concomitant risk associated with these investments.

66.     At all times across the glide path, the Active suite's top three domestic equity positions were and are in Fidelity Series funds, created for exclusive use in the Freedom funds, two of which have dramatically trailed their respective indices over their entire respective lifetimes.  The Intrinsic Opportunities Fund, which is currently allocated 7.97% of the total

---

[11]Ben Johnson, *How Actively and Passively Managed Funds Performed: Year-End 2018*, MORNINGSTAR (Feb. 12, 2019), https://www.morningstar.com/insights/2019/02/12/active-passive-funds.

assets in the 2040-2065 Funds, has, over its lifetime, missed its benchmark, the Russell 3000 Index, by an incredible 185 basis points (1.85%) on an annualized basis. The Large Cap Stock Fund, to which 6.95% of the total assets in the 2040-2065 Funds are allocated, has suffered even worse underperformance: Its annualized lifetime returns trail that of its benchmark, the S&P 500 Index, by 276 basis points (2.76%). While the portfolio of the Active suite is diversified among 32 underlying investment vehicles, the two aforementioned series funds represent approximately 15% of the 2040 through 2065 vintages, meaning for at least 20 years (because those target date funds have an associated target retirement date of at least twenty years from now), 15% of investor dollars are subject to the poor judgment exercised by just those two managers.

67.     Manager performance issues among the underlying investments in the Active suite are not limited to the largest positions. Of the 26 actively managed Fidelity Series Funds in the Active suite portfolio, half similarly trail their respective benchmarks over their lifetimes. Clearly, Defendants never undertook a review of the performance of the funds comprising the Active suite portfolio during the Class Period.

68.     Moreover, as of the start of the Class Period, several of the underlying funds used within the Active suite portfolio lacked performance history sufficient to support a meaningful analysis. Accordingly, no prudent fiduciary would have been able to properly evaluate these funds. Indeed, as illustrated in the table below, 14 out of 24 funds[12] failed to meet the basic criteria of at least a five-year performance track record, meaning almost two-thirds of the funds used in the Active suite portfolio would have failed one of the most basic fiduciary requirements.

---

[12] The two short-term debt funds, namely the Fidelity Institutional Money Market Fund and the Fidelity Short-Term Bond Fund, are excluded. History and outperformance are less relevant in this market segment given the limited scope for outperformance.

Defendants failed to undertake any such analysis at the start of, or at any subsequent point during, the Class Period.

| Underlying Fund Name | Ticker | Inception Date | Less than 5-Years Performance |
|---|---|---|---|
| Fidelity Series 100 Index | FOHIX | 20070329 | |
| Fidelity Series 1000 Value Index | FSIOX | 20130711 | x |
| Fidelity Series All-Sector Equity | FSAEX | 20081017 | |
| Fidelity Series Blue Chip Growth | FSBDX | 20130711 | x |
| Fidelity Series Commodity Strategy | FCSSX | 20090110 | |
| Fidelity Series Emerging Markets Debt | FEDCX | 20110317 | x |
| Fidelity Series Emerging Markets | FEMFX | 20080912 | |
| Fidelity Series Equity-Income | FRLLX | 20120612 | x |
| Fidelity Series Floating Rate Hi Inc | FFHCX | 20111020 | x |
| Fidelity Series Growth & Income | FTBTX | 20120612 | x |
| Fidelity Series Growth Company | FCGSX | 20130711 | x |
| Fidelity Series High Income | FSHNX | 20111003 | x |
| Fidelity Series Infl-Prtct Bd Idx | FSIPX | 20090929 | |
| Fidelity Series International Growth | FIGSX | 20090312 | |
| Fidelity Series International Sm Cap | FSTSX | 20090312 | |
| Fidelity Series International Value | FINVX | 20090312 | |
| Fidelity Series Intrinsic Opps | FDMLX | 20120612 | x |
| Fidelity Series Investment Grade Bond | FSIGX | 20080810 | |
| Fidelity Series Opportunistic Insights | FVWSX | 20120612 | x |
| Fidelity Series Real Estate Equity | FREDX | 20111020 | x |
| Fidelity Series Real Estate Income | FSREX | 20111020 | x |
| Fidelity Series Small Cap Discovery | FJACX | 20130711 | x |
| Fidelity Series Small Cap Opps | FSOPX | 20070322 | |
| Fidelity Series Stk Selec Lg Cp Val | FBLEX | 20120612 | x |

69.     Of the remaining underlying funds with a sufficient track record, only two had outperformed their prospectus benchmark over the previous three- and five-year period as of the start of the Class Period.  Accordingly, 22 of the 24 funds comprising the Active suite portfolio at the start of the pertinent period would not have fulfilled the most basic fiduciary criteria. Clearly, Defendants neglected to analyze the underlying funds to determine whether the Active suite was appropriate for the Plan.

70.     Compounding the level of risk inherent in the Active suite's underlying holdings is the  managers' approach to portfolio construction and asset allocation.  As discussed above,

the Active and Index suites appear to follow essentially the same glide paths and strategy.  The chart below shows the percentage of assets devoted to equities in each vintage:

| Equity Glide Path | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Years to Target Retirement Year | | | | | | | | | | | |
| Series | 40 | 35 | 30 | 25 | 20 | 15 | 10 | 5 | 0 | -5 | -10 | -15 | -20 |
| Fidelity Freedom | 90 | 90 | 90 | 90 | 89 | 78 | 65 | 58 | 53 | 43 | 35 | 24 | 24 |
| Fidelity Freedom Index | 90 | 90 | 90 | 90 | 90 | 80 | 65 | 59 | 52 | 43 | 34 | 24 | 24 |

71.     This chart only considers the mix of the portfolio at the level of stocks, bonds and cash.  A deeper examination of the sub-asset classes of the Active suite's portfolio, however, exposes the significant risks its managers take to boost returns.  Across the glide path, the Active suite allocates approximately 1.5% more of its assets to riskier international equities than the Index suite.  The Active suite also has higher exposure to riskier classes like emerging markets and high yield bonds.  Defendants failed to investigate the level of risk inherent in the Active suite portfolio and did not determine whether the risk level was suitable for Plan participants at any point during the Class Period.

72.     Since the Active suite series underwent a strategy overhaul in 2013 and 2014, its managers have had the discretion to deviate from the glide path allocations by ten percentage points in either direction.  In a departure from the accepted wisdom that TDFs should maintain pre-set allocations, Fidelity encouraged its portfolio managers to participate in "active asset allocation," an attempt to time market shifts in order to locate underpriced securities.  This strategy heaps further unnecessary risk on investors, such as Plan participants, in the Active suite.  In fact, a March 2018 Reuters special report on the Fidelity Freedom funds (the "Reuters Report") details how many investors lost confidence in the Active suite "because of their history of underperformance, frequent strategy changes and rising risk."[13]  The report quotes a member

---

[13] Tim McLaughlin & Renee Dudley, *Special Report: Fidelity puts 6 million savers on risky path to retirement*,

of Longfellow Advisors, who told Reuters that, after the 2014 changes, "it was not clear to us that [the managers of the Active suite] knew what they were doing."[14]  While many TDF managers are increasing exposure to riskier investments in an effort to augment performance, the president of research firm Target Date Solutions cautions that the Active suite has gone further down this path than its peers.[15]  Other industry experts have criticized the "chaotic glide paths" of the Active suite relative to peer target date providers.[16]  Morningstar has also noted in the past that active management has hindered the Active suite's performance, criticizing a previous poor decision to heavily weight to commodities, and similarly characterized Fidelity's shifts in the stock allocation between 1996 and 2010 as "shocking" and "seemingly chaotic."  Yet, since 2014, a fund family with a history of poor decisions has been given "carte blanche" to take further risks, to the severe detriment of the Plan and its participants.  Defendants never initiated or undertook any review or scrutiny of the Active suite's strategy changes.

73.     Far from being the "lifetime savings solution" Fidelity promotes, as a result of their managers' desire and latitude to assume more risk, the Active suite exposes investors to significant losses in the event of volatility like the downturn experienced during the COVID-19 pandemic.

74.     Morningstar analyst Jeff Holt opines that the popularity of target date funds derives from investors' belief that the funds are designed to "not lose money."  As a result, the average unsophisticated investor, such as the typical participant in the Plan, tends to gravitate

---

REUTERS, March 5, 2018, https://www.reuters.com/article/us-funds-fidelity-retirement-special-rep/special-report-fidelity-puts-6-million-savers-on-risky-path-to-retirement-idUSKBN1GH1SI.

[14]*Id.*

[15]*Id.*

[16]Idzorek, T., J. Stempien, and N. Voris, 2011, Bait and Switch: Glide Path Instability, Ibbotson Associates.

toward the all-in-one savings solution a target date fund offers.  Given this reality, Plan

participants should be shielded from the riskiest fund families where active manager decisions

could amplify losses in periods of market decline.

ii.    <u>The Active Suite's Considerable Cost</u>

75.    Even a minor increase in a fund's expense ratio[17] can considerably reduce long-

term retirement savings.  The fees charged by the Active suite are many multiples higher than the

Index suite's industry-leading low costs.  While the Institutional Premium share class for each

target year of the Index suite charges a mere 8 basis points (0.08%), the K share class of the

Active suite—which the Plan offers—has expense ratios ranging from 42 basis points (0.42%) to

65 basis points (0.65%).

| Cost Comparison | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Freedom Suite | Ticker | Exp Rat | Freedom Index Suite | Ticker | Exp Rat | Difference |
| Income K | FNSHX | 0.42% | Income Inst Prem | FFGZX | 0.08% | -0.34% |
| 2005 K | FSNJX | 0.42% | 2005 Inst Prem | FFGFX | 0.08% | -0.34% |
| 2010 K | FSNKX | 0.46% | 2010 Inst Prem | FFWTX | 0.08% | -0.38% |
| 2015 K | FSNLX | 0.49% | 2015 Inst Prem | FIWFX | 0.08% | -0.41% |
| 2020 K | FSNOX | 0.53% | 2020 Inst Prem | FIWTX | 0.08% | -0.45% |
| 2025 K | FSNPX | 0.56% | 2025 Inst Prem | FFEDX | 0.08% | -0.48% |
| 2030 K | FSNQX | 0.60% | 2030 Inst Prem | FFEGX | 0.08% | -0.52% |
| 2035 K | FSNUX | 0.63% | 2035 Inst Prem | FFEZX | 0.08% | -0.55% |
| 2040 K | FSNVX | 0.65% | 2040 Inst Prem | FFIZX | 0.08% | -0.57% |
| 2045 K | FSNZX | 0.65% | 2045 Inst Prem | FFOLX | 0.08% | -0.57% |
| 2050 K | FNSBX | 0.65% | 2050 Inst Prem | FFOPX | 0.08% | -0.57% |
| 2055 K | FNSDX | 0.65% | 2055 Inst Prem | FFLDX | 0.08% | -0.57% |
| 2060 K | FNSFX | 0.65% | 2060 Inst Prem | FFLEX | 0.08% | -0.57% |
| 2065 K | FFSDX | 0.65% | 2065 Inst Prem | FFIKX | 0.08% | -0.57% |

76.    Higher fees significantly reduce retirement account balances over time.

Considering just the gap in expense ratios from the Plan's investment in the Active suite to the

Institutional Premium share class of the Index suite, in 2020 alone, the Plan could have saved

---

[17]A fund's expense ratio is the total annual cost to an investor, expressed as a percentage of assets.

approximately $4.83 million in costs.  This tremendous cost difference goes straight into Fidelity's pockets and is paid for by Plan participants.

77.     As the costs for recordkeeping services have dropped precipitously over the past decade,[18] recordkeepers like Fidelity have been forced to chase profits elsewhere.  The management fees derived from a plan's use of a provider's investment offerings substantially trump any compensation for recordkeeping services.  Thus, Fidelity is heavily incentivized to promote its own investment products, specifically those that charge the highest fees, to each plan for which it also provides recordkeeping services, including the Plan.

iii.     <u>Investors Have Lost Faith in the Active Suite</u>

78.     The flow of funds to or from target date families is one indicator of the preferences of investors at large.  According to Morningstar's report on the 2019 Target Date Fund Landscape,[19] investor demand for low-cost TDF options has skyrocketed in recent years. Unsurprisingly, the Index suite has seen significant inflows, receiving an estimated $4.9 billion in new funds in 2018.  At the same time, investor confidence in the Active suite has deteriorated: 2018 alone saw an estimated $5.4 billion in net outflows.  And the movement of funds out of the Active suite has been substantial for years.  In fact, the Reuters Report notes that nearly $16 billion has been withdrawn from the fund family between 2014 and 2018.  Defendants' conduct in offering and maintaining the Active suite in the Plan evidences their failure to acknowledge or act upon investors' crumbling confidence in the Active suite, while ignoring the simultaneous and justified surge in preference for low-cost TDFs such as the Index suite.

---

[18]*NEPC: Corporate Defined Contribution Plans Report Flat Fees*, BUSINESS WIRE (Aug. 23, 2017), https://www.businesswire.com/news/home/20170823005592/en/NEPC-Corporate-Defined-Contribution-Plans-Report-Flat-Fees?msclkid=e2a6ea9ecd7711ec9bec155bdd0ede73.

[19]MORNINGSTAR, 2019 TARGET-DATE FUND LANDSCAPE: SIMPLIFYING THE COMPLEX (2019).

iv.     The Active Suite's Inferior Returns

79.     The most significant of the myriad issues with the Active suite is its miserable performance when measured against any of the other most widely utilized TDF offerings. Throughout the Class Period, there were many TDFs that consistently outperformed the Active suite, providing investors with substantially more capital appreciation.  It is apparent, given the continued presence of the Active suite in the Plan's investment menu, that Defendants never heeded the numerous red flags detailed above and neglected to scrutinize the performance of the Active suite against any of the more appropriate alternatives in the TDF marketplace.

80.     A prudent fiduciary evaluates TDF returns not only against an appropriate index or a group of peers TDFs, but also against specific, readily investable alternatives to ensure that participants are benefitting from the current TDF offering.  At the start of the Class Period, the Active suite ranked dead last when measured against the primary offerings of four of the five largest non-Fidelity managers in the TDF marketplace.[20]  The performance table below compares the three- and five-year annualized returns of several representative vintages of the Active suite to those of the same iterations of the Vanguard Target Retirement Funds Investor Class, the T. Rowe Price Retirement Funds Investor Class, the American Funds Target Date Funds Class R6, and the J.P. Morgan SmartRetirement Funds Institutional Class.  This information was available to Defendants at the start of the Class Period from the most recent quarter-end (the Fourth Quarter of 2015).  Defendants could have sought this data from Fidelity or the Plan's other service providers, or easily obtained it themselves through just a few clicks of a computer mouse.

---

[20]Along with Vanguard, Fidelity, T. Rowe Price, American Funds, and J.P. Morgan, BlackRock is among the six largest TDF managers.  BlackRock's only widely utilized TDF suite, the BlackRock LifePath Index Funds (the "LifePath Funds"), did not yet have a five-year performance history by the start of the Class Period, and accordingly, it is not included in the performance comparison tables in this Complaint.

| Three-Year Annualized Return as of 4Q15 | | | | | |
|---|---|---|---|---|---|
| | Retirement | 2020 | 2030 | 2040 | 2050 |
| American Funds | 6.02% | 8.28% | 10.56% | 10.87% | 10.91% |
| T. Rowe Price | 5.26% | 7.52% | 9.28% | 10.23% | 10.23% |
| Vanguard | 3.71% | 7.21% | 8.52% | 9.46% | 9.47% |
| J.P. Morgan | 3.82% | 6.32% | 8.26% | 9.14% | 9.16% |
| **Fidelity Freedom** | **2.66%** | **5.96%** | **7.61%** | **8.50%** | **8.75%** |

| Five-Year Annualized Return as of 4Q15 | | | | | |
|---|---|---|---|---|---|
| | Retirement | 2020 | 2030 | 2040 | 2050 |
| American Funds | 6.43% | 7.72% | 9.10% | 9.22% | 9.25% |
| T. Rowe Price | 5.68% | 7.15% | 8.21% | 8.73% | 8.76% |
| Vanguard | 4.91% | 6.85% | 7.59% | 8.11% | 8.12% |
| J.P. Morgan | 4.47% | 6.38% | 7.32% | 7.85% | 7.87% |
| **Fidelity Freedom** | **3.27%** | **5.58%** | **6.49%** | **6.89%** | **6.92%** |

*Neither American Funds or T. Rowe Price offer a Retirement vintage. Accordingly, the 2010 vintage is used as a proxy for participants already in retirement.

81.     Across the board, at all stages along the Active suite's glide path from aggressive to conservative, the Active suite's returns paled in comparison to those of the readily available alternatives.  Defendants, however, neglected to undertake any analysis of the Active suite against appropriate peers using the above or other important performance metrics.[21]  If Defendants had taken their fiduciary duties seriously during the Class Period, they would have replaced the Active suite with a suitable alternative TDF.  Their failure to do so caused Plan participants to miss out on substantial investment returns for their retirement savings.

### 3.     The Plan's Objectively Imprudent Investment Options

82.     In addition to the Active suite, Defendants have saddled participants with other objectively imprudent investment options.  It is a basic principle of investment theory that the risks associated with an investment must first be justified by its potential returns for that

---

[21]Investment professionals and investment policy statements for virtually all competently managed defined contribution retirement plans appropriately recognize that the three-year and five-year annualized returns are the most important metrics for evaluating whether investment options should be maintained in a retirement plan lineup.

investment to be rational.  This principle applies even before considering the purpose of the investment and the needs of the investor.  The Capital Asset Pricing Model ("CAPM"), which is used for pricing securities and generating expected returns for assets given the risk of those assets and the cost of capital, provides a mathematical formula distilling this principle:

$ER_i = R_f + \beta_i(ER_m - R_f)$, where:

$ER_i$ = expected return of investment
$R_f$ = risk-free rate
$\beta_i$ = beta of the investment
$(ER_m - R_f)$ = market risk premium

Applied here, the $\beta_i$ is the risk associated with an actively-managed mutual fund or collective trust, which can only be justified if the $ER_i$ is, at the very least, above that of its benchmark, $R_f$.[22] Otherwise, the model collapses, and it would be imprudent to assume any risk without achieving associated return above the benchmark returns.

i.     The Parnassus Core Equity Fund

83.     The Parnassus Core Equity Fund Institutional Class ("Parnassus") has consistently and significantly underperformed its benchmark, the S&P 500 Index, on a rolling three- and five-year annualized basis.  However, due to the Committees' deficient investment review procedures, a general lack of understanding of how to evaluate investment returns, and/or an attitude of neglect towards the plan, Defendants failed to appropriately scrutinize, and ultimately replace, this poor performing fund.  At their regular meetings during the Class Period, Committee members had access to the below returns data in real time, which would have been

---

[22]In this instance, the index benchmark takes place of the "risk-free" rate, as the investment option is measured against the performance of that investment category, rather than the typical U.S. Treasury Bonds or equivalent government security in a general CAPM calculation.

sufficient to convince a fiduciary following a prudent process that the Parnassus Fund should be

removed:

- Just two quarters into the Class Period, as of the end of the Third Quarter of 2016, the Parnassus Fund's 3- and 5-year annualized returns trailed those of its benchmark by 0.40% and 0.05%, respectively.

- As of the end of the Fourth Quarter of 2016, the Parnassus Fund's 3- and 5-year annualized returns trailed those of its benchmark by 0.74% and 0.24%, respectively.

- As of the end of the First Quarter of 2017, the Parnassus Fund's 3-year return trailed that of its benchmark by 0.97%, while it's 5-year return exceeded the benchmark by 0.43%.  The latter figure did not mark the beginning of any positive trend, as the Fund's performance deteriorated significantly after this point.

- As of the end of the Second Quarter of 2017, the Parnassus Fund's 3- and 5-year annualized returns trailed those of its benchmark by 1.93% and 0.13%, respectively.

- As of the end of the Third Quarter of 2017, the Parnassus Fund's 3- and 5-year annualized returns trailed those of its benchmark by 1.75% and 0.52%, respectively.

- As of the end of the Fourth Quarter of 2017, the Parnassus Fund's 3- and 5-year annualized returns trailed those of its benchmark by 2.62% and 1.41%, respectively.

- As of the end of the First Quarter of 2018, the Parnassus Fund's 3- and 5-year annualized returns trailed those of its benchmark by 1.80% and 1.84%, respectively.

84.     At this point, consistent with their regular monitoring duties, the Committees

should have reviewed at least *four consecutive quarters* of the Parnassus Fund's

underperformance.[23]  This troubling pattern was ignored, however, and Defendants allowed the

Fund to linger even as its performance issues persisted:

- As of the end of the Second Quarter of 2018, the Parnassus Fund's 3- and 5-year annualized returns trailed those of its benchmark by 1.84% and 1.24%, respectively.

---

[23] Four quarters of trailing 3- or 5-year returns is distinct from four quarters of returns.  Plaintiffs note, for example, four consecutive quarters of 3-year underperformance to show that, were the Committees meeting on a regular, quarterly basis, they would have reviewed 3-year underperformance at four straight separate meetings.  Any trailing 3- or 5-year underperformance as of a single quarter-end is worth a fiduciary's attention; trends such as those detailed in this Amended Class Action Complaint are cause for considerable concern.

- As of the end of the Third Quarter of 2018, the Parnassus Fund's 3- and 5-year annualized returns trailed those of its benchmark by 2.89% and 1.54%, respectively.

- As of the end of the Fourth Quarter of 2018, the Parnassus Fund's 3- and 5-year annualized returns trailed those of its benchmark by 0.32% and 0.37%, respectively.

- As of the end of the First Quarter of 2019, the Parnassus Fund's 3- and 5-year annualized returns trailed those of its benchmark by 0.91% and 0.23%, respectively.

85.     At this point, the Committees should have reviewed returns data demonstrating the Parnassus Fund's persistent inability to beat its benchmark over periods most closely approximating a market cycle for *eight consecutive quarters.*

86.     As discussed above, active managers face an uphill battle to provide value by consistently beating their benchmarks and compensating for fees higher than those funds that simply track the benchmark.  Given the presence in the Plan lineup of an index fund that already tracks the Core Equity Fund's benchmark (the Fidelity 500 Index Fund), there was no reason to include an actively managed fund in the U.S. large cap space, particularly not one so poor. Indeed, Morningstar concluded in its year-end 2018 report on active versus passive management that long term success rates, defined as a fund's ability to survive and outperform a low-cost index fund tracking its benchmark over longer time horizons, were lowest among U.S. large cap funds.  The Parnassus Fund's consistent and substantial underperformance against its benchmark substantiates this observation.





87.     Defendants' misguided decision to retain the Parnassus fund was exacerbated by the fund's complete inability to provide participants with returns to justify its 63-basis point (0.63%) expense ratio.  Indeed, if Defendants were insistent on offering an actively managed U.S. large cap blend fund in the Plan investment menu, participants would have been better served by, for example, the Jensen Quality Growth Fund ("Jensen") or JPMorgan Equity Focus

Fund ("JP Morgan").[24]  By the end of the First Quarter of 2018, at which point the Parnassus

Fund had trailed the S&P 500 Index on a 3- and 5-year annualized basis for four consecutive

quarters and ranked in the 64th percentile among U.S. large cap blend funds over the same

periods, the Jensen Fund's 3- and 5-year returns exceeded the index and ranked in the 6th and

10th percentile, respectively, of that same peer group, and the JPMorgan Fund's 3- and 5-year

returns also beat the index and both ranked in the 8th percentile.  Both the Jensen and JPMorgan

Funds remained considerably better active domestic large cap funds than the Parnassus Fund

throughout the Class Period.  Defendants' failure to eliminate the Parnassus Fund despite its

underachievement was a severe breach of fiduciary duty.

ii.    The Invesco Diversified Dividend Fund

88.     The Invesco Diversified Dividend Fund Class R6 ("Diversified Dividend") has

also consistently and significantly underperformed its benchmark, the Russell 1000 Value Index,

on a rolling three- and five-year annualized basis.  However, the Committees again neglected to

follow a prudent investment evaluation process and ignored this negative trend.  At their regular

meetings during the Class Period, Committee members had access to the below returns data in

real time, which would have been sufficient to convince a fiduciary following a prudent process

that the Diversified Dividend Fund should be removed:

- By the end of the Fourth Quarter of 2017, the Diversified Dividend Fund's trailing returns fell below those of its benchmark and its performance ranked poorly compared to its peers (funds in the same Morningstar category).  Specifically, as of the end of the Fourth Quarter of 2017, the Diversified Dividend Fund's 3- and 5-year annualized returns trailed those of its benchmark by 0.24% and 0.90%, respectively, and ranked in the 65th and 66th percentile among its peers, respectively.

- As of the end of the First Quarter of 2018, the Diversified Dividend Fund's 3- and 5-year annualized returns trailed those of its benchmark by 1.54% and 1.14%, respectively, and ranked in the 81st and 77th percentile among its peers, respectively.

---

[24] All size and style classifications are per Morningstar.

- As of the end of the Second Quarter of 2018, the Diversified Dividend Fund's 3- and 5-year annualized returns trailed those of its benchmark by 1.36% and 0.81%, respectively, and ranked in the 82nd and 70th percentile among its peers, respectively.

- As of the end of the Third Quarter of 2018, the Diversified Dividend Fund's 3- and 5-year annualized returns trailed those of its benchmark by 4.36% and 1.07%, respectively, and ranked in the 96th and 72nd percentile among its peers, respectively.

89.     At this point, consistent with their regular monitoring duties, the Committees should have reviewed at least *four consecutive quarters* of deplorable returns by the Diversified Dividend Fund.  These indicators were ignored, and the poor returns persisted, further harming participant retirement accounts:

- As of the end of the Fourth Quarter of 2018, the Diversified Dividend Fund's 3- and 5-year annualized returns trailed those of its benchmark by 2.06% and 0.14%, respectively, and its 3-year return ranked in the 87th percentile among its peers.

- As of the end of the First Quarter of 2019, the Diversified Dividend Fund's 3- and 5-year annualized returns trailed those of its benchmark by 3.50% and 0.37%, respectively, and ranked in the 96th and 53rd percentile among its peers, respectively.

- As of the end of the Second Quarter of 2019, the Diversified Dividend Fund's 3- and 5-year annualized returns trailed those of its benchmark by 3.26% and 0.20%, respectively, and ranked in the 96th and 50th percentile among its peers, respectively.

- As of the end of the Third Quarter of 2019, the Diversified Dividend Fund's 3-year return trailed its benchmark by 1.40% and ranked in the 82nd percentile among its peers, while its 5-year return exceeded the benchmark by 0.46%.  This slight uptick was temporary, as the Fund's 5-year performance measurements returned to its dismal trend the following quarter.

90.     At this point, though the Diversified Dividend Fund's 5-year returns briefly beat those of the benchmark and ranked in the top half of its peers, its 3-year performance had trailed the benchmark and ranked in the bottom quartile of its peers for *eight consecutive quarters* (with the exception of one quarter, where the Fund's 3-year return ranked a still-terrible 65th among peers).  Inexplicably, the Committees continued to ignore the Diversified Dividend Fund's pitiful

performance.  The Plan still offers the Fund as of the date of the filing of this Amended Class

Action Complaint, even though its performance has continued to lag the benchmark and rank in

the bottom half (and most often in the bottom quartile) among its peers:

- As of the end of the Fourth Quarter of 2019, the Diversified Dividend Fund's 3- and 5-year annualized returns trailed those of its benchmark by 1.60% and 0.12%, respectively, and ranked in the 85th and 53rd percentile among its peers, respectively.

- As of the end of the First Quarter of 2020, the Diversified Dividend Fund's 3-year return trailed its benchmark by 0.06% and ranked in the 57th percentile among its peers, while its 5-year return matched the benchmark.

- As of the end of the Second Quarter of 2020, the Diversified Dividend Fund's 3- and 5-year annualized returns trailed those of its benchmark by 0.51% and 0.33%, respectively, and ranked in the 66th and 58th percentile among its peers, respectively.

- As of the end of the Third Quarter of 2020, the Diversified Dividend Fund's 3- and 5-year annualized returns trailed those of its benchmark by 0.72% and 2.03%, respectively, and ranked in the 61st and 81st percentile among its peers, respectively.

- As of the end of the Fourth Quarter of 2020, the Diversified Dividend Fund's 3- and 5-year annualized returns trailed those of its benchmark by 0.74% and 1.92%, respectively, and ranked in the 60th and 82nd percentile among its peers, respectively.

- As of the end of the First Quarter of 2021, the Diversified Dividend Fund's 3- and 5-year annualized returns trailed those of its benchmark by 1.34% and 3.25%, respectively, and ranked in the 66th and 92nd percentile among its peers, respectively.

- As of the end of the Second Quarter of 2021, the Diversified Dividend Fund's 3- and 5-year annualized returns trailed those of its benchmark by 1.88% and 3.25%, respectively, and ranked in the 73rd and 94th percentile among its peers, respectively.

- As of the end of the Third Quarter of 2021, the Diversified Dividend Fund's 3- and 5-year annualized returns trailed those of its benchmark by 1.28% and 2.57%, respectively, and ranked in the 67th and 90th percentile among its peers, respectively.

- As of the end of the Fourth Quarter of 2021, the Diversified Dividend Fund's 3- and 5-year annualized returns trailed those of its benchmark by 2.98% and 2.49%, respectively, and ranked in the 86th and 92nd percentile among its peers, respectively.





91.     All of the above returns data was available in real time to Defendants at the

moments they decided to retain the Diversified Dividend Fund.  When an investment option's

track record is so apparently poor, as it is here, prudent fiduciaries should necessarily replace the

fund with an alternative that has demonstrated the ability to consistently outperform the

benchmark, or, at the very least, retain an alternative that tracks the benchmark.  By way of

example and to illustrate, there is a Vanguard Russell 1000 Value Index Fund that simply tracks

the Russell 1000 Value Index, with a very low expense ratio of 7 basis points (0.07%) for the Institutional share class.  While participants should have had the option to achieve the index's returns at minimal cost, Defendants' imprudence in retaining the Diversified Dividend Fund instead forced participants to pay 43 basis points (0.43%) to consistently lag the index.

92.     There were also several other prudent available actively managed alternatives that Defendants could have selected for the Plan in place of the Diversified Dividend Fund including, for example, the Columbia Dividend Income Fund ("Columbia") or the Parnassus Endeavor Fund ("Endeavor").  By the end of the Third Quarter of 2018, the Diversified Dividend Fund's 3- and 5-year annualized returns had trailed the Russell 1000 Value Index on for four consecutive quarters and ranked no higher than the 65th and 66th percentile, respectively, among U.S. large cap value funds.  Yet over the same periods, the Columbia Fund's 3- and 5-year returns exceeded the index and ranked in the 10th and 5th percentile, respectively, among that same peer group, and the Endeavor Fund's 3- and 5-year returns also beat the index and ranked in the 3rd and 1st percentile, respectively.  Both the Columbia and Endeavor Funds remained considerably better active domestic large cap value funds than the Diversified Dividend Fund throughout the Class Period.  Defendants' failure to replace the Diversified Dividend Fund with better performing alternatives was a severe breach of fiduciary duty.

### iii.     The AMG TimesSquare Mid Cap Growth Fund

93.     The AMG TimesSquare Mid Cap Growth Fund Class Z ("AMG") was added to the Plan lineup at some point prior to December 31, 2019 despite its lengthy unimpressive track record.  The addition of the AMG Fund was inappropriate and illogical, as by the start of 2019, the Fund had consistently and significantly underperformed its benchmark, the Russell MidCap Growth Index, on a rolling three- and five-year annualized basis for at least *the previous sixteen*

*quarters.*  The below graphs represent performance data available to Defendants at the moment

they selected the AMG Fund for the Plan.[25]





94.     In addition to a demonstrated inability to beat its benchmark, the AMG Fund had

also regularly ranked in the bottom half of its peers prior to its selection:

---

[25]The exact date in 2019 on which the AMG Fund was added to the Plan lineup is not publicly available or otherwise available to Plaintiffs.  Accordingly, the below charts include returns data that would have been available to the Committees in the Fourth Quarter of 2019.  If the decision to add the AMG Fund was made prior, the Committees would have reviewed the same returns data up through the prior quarter-end.

| Quarter End | AMG Fund 3-Year Rank | AMG Fund 5-Year Rank |
|:---:|:---:|:---:|
| 1Q18 | 49th percentile | 66th percentile |
| 2Q18 | 54th percentile | 66th percentile |
| 3Q18 | 65th percentile | 49th percentile |
| 4Q18 | 45th percentile | 50th percentile |
| 1Q19 | 60th percentile | 62nd percentile |
| 2Q19 | 53rd percentile | 51st percentile |
| 3Q19 | 39th percentile | 43rd percentile |

95.    No prudent fiduciary armed with the foregoing performance information would have determined the AMG Fund to be an appropriate fit for the Plan.  Defendants' decision to select the fund in spite of its demonstrated inability to provide participants with returns to justify its significant 98 basis point (0.98%) expense ratio was a severe breach of fiduciary duty. Participants would have been better served by exposure to domestic mid-cap growth equities through a passive investment, such as the Vanguard Mid-Cap Growth Index Fund, or any of several other prudent and available actively managed alternatives that displayed much better performance when compared to their peers and the benchmark around the time the AMG Fund was selected, including, for example, the Champlain Mid Cap Fund ("Champlain") or the ClearBridge Select Fund ("ClearBridge").  By the end of the First Quarter of 2019, the AMG Fund's 3- and 5-year annualized returns trailed the Russell Mid Cap Growth Index by 1.33% and 1.89%, respectively, and ranked in the 60th and 62nd percentile among U.S. mid cap growth funds.  In contrast, over the same periods, the Champlain Fund's 3- and 5-year returns exceeded the index and ranked in the 14th and 7th percentile, respectively, among that same peer group, and the ClearBridge Fund's 3- and 5-year returns also beat the index and both ranked in the 1st percentile.  Both the Champlain and ClearBridge Funds remained considerably better active domestic mid cap growth funds than the AMG Fund throughout the Class Period.  Defendants'

selection of the underperforming AMG Fund despite its negative track record was a severe breach of fiduciary duty.

### iv.    The Fidelity High Income Fund

96.    The Fidelity High Income Fund ("High Income") has consistently and significantly underperformed its benchmark, the Intercontinental Exchange Bank of America Merrill Lynch U.S. High Yield/U.S. High Yield Constrained Blend Index ("ICE BofAML US HY/US HY Const Blend Index"), on a rolling five- and ten-year annualized basis.[26]  Defendants had access to the below returns data, as well as significantly more that is not currently publicly available, in real time during the Class Period:

**5-Year Trailing Performance**

| As of | Performance, adjusted for investment expense | ICE BofAML US HY/US HY Const Blend Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 4Q2013 | 16.90% | 18.70% | -1.80% |
| 4Q2014 | 7.91% | 8.85% | -0.94% |
| 4Q2015 | 4.01% | 4.84% | -0.83% |
| 4Q2016 | 6.43% | 7.35% | -0.92% |
| 4Q2017 | 5.23% | 5.81% | -0.58% |
| 4Q2018 | 3.36% | 3.83% | -0.47% |
| 4Q2019 | 5.83% | 6.14% | -0.31% |
| 4Q2020 | 7.53% | 8.42% | -0.89% |

---

[26]Available performance data for the High Income Fund's spliced benchmark is limited to the one-, five- and ten-year returns displayed in the Fund's annual prospectuses.



**10-Year Trailing Performance**

| As of | Performance, adjusted for investment expense | ICE BofAML US HY/US HY Const Blend Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 4Q2013 | 7.92% | 8.46% | -0.54% |
| 4Q2014 | 7.09% | 7.62% | -0.53% |
| 4Q2015 | 6.13% | 6.82% | -0.69% |
| 4Q2016 | 6.62% | 7.45% | -0.83% |
| 4Q2017 | 7.25% | 7.96% | -0.71% |
| 4Q2018 | 9.92% | 11.02% | -1.10% |
| 4Q2019 | 6.87% | 7.48% | -0.61% |
| 4Q2020 | 5.76% | 6.61% | -0.85% |



97.     The High Income fund's persistent poor performance is further reflected in its inability to beat the benchmark in ten of the last eleven calendar years.  Defendants had access to the below returns data, as well as significantly more that is not currently publicly available, in real time during the Class Period:

**Annual Return v. Benchmark**

| Year | Performance, adjusted for investment expense | ICE BofAML US HY/US HY Const Blend Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|------|------|------|------|
| 2011 | 3.41% | 4.37% | -0.96% |
| 2012 | 14.89% | 15.55% | -0.66% |
| 2013 | 6.68% | 7.41% | -0.73% |
| 2014 | 1.53% | 2.51% | -0.98% |
| 2015 | -5.40% | -4.61% | -0.79% |
| 2016 | 15.97% | 17.49% | -1.52% |
| 2017 | 8.58% | 7.48% | 1.10% |

| 2018 | -2.44% | -2.27% | -0.17% |
| 2019 | 14.25% | 14.41% | -0.16% |
| 2020 | 2.44% | 6.07% | -3.63% |
| 2021 | 4.23% | 5.35% | -1.12% |



98.     As of the start of the Class Period, the High Income had failed to beat the benchmark in any of the preceding five calendar years, had five- and ten-year returns that similarly displayed the Fund's inability to generate returns greater than the benchmark over longer periods, and had three- and five-year performance that ranked in the 70th and 62nd percentile, respectively, among other high yield bond funds.  No objective evaluation of these metrics could have deemed the High Income Fund appropriate for continued inclusion in the Plan lineup.

99.     When an investment option's track record is so apparently poor, as it is here, prudent fiduciaries should necessarily replace the fund with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, retain an alternative

that tracks the benchmark.  By way of example and to illustrate, there is a BlackRock High Yield Fund that regularly beats both the High Income Fund and its benchmark, with an expense ratio of 51 basis points (0.51%) for the K share class.  Defendants' imprudence in retaining the fund through its persistent underperformance forced participants to pay 69 basis points (0.69%) to consistently lag the index.

100.    Moreover, there were several other prudent and available actively managed alternatives that Defendants could have selected for the Plan in place of the High Income Fund, including, for example, the Fidelity Advisor High Income Advantage Fund ("Advantage") or the PGIM High Yield Fund ("PGIM").  As of the start of the Class Period, the High Income Fund had failed to beat its benchmark by any trailing measure and had 3- and 5-year annualized returns that ranked in the 70th and 62nd percentile, respectively, among high yield bond funds. But the Advantage Fund's 3- and 5-year returns beat the benchmark and ranked in the 5th and 6th percentile, respectively, among that same peer group, and the PGIM Fund's 3- and 5-year returns also exceeded the benchmark and ranked in the 27th and 17th percentile, respectively.  Both the Advantage and PGIM Funds remained considerably better active high yield bond funds than the High Income Fund throughout the Class Period.  Defendants' failure to replace the High Income Fund with better performing alternatives was a breach of fiduciary duty.

                                v.    The Lazard Emerging Markets Equity Portfolio

101.    The Lazard Emerging Markets Equity Portfolio Institutional Class ("Lazard") was replaced at some point after December 31, 2020,[27] but had such a consistently poor track record as measured against both its benchmark, the MSCI Emerging Markets Index, and its emerging market fund peers, that it is unlikely Defendants monitored the Lazard Fund at all during the

---

[27] The Lazard Fund is no longer offered in the Plan investment menu as of the filing of this Amended Class Action Complaint. It was removed at some point in either 2021 or early 2022.

Class Period. At their regular meetings during the Class Period, Committee members had access to the below returns data in real time, which would have been sufficient to convince a fiduciary following a prudent process that the Lazard Fund should be removed long before it ultimately was:

- As of the first quarter-end prior to the start of the Class Period, the Fourth Quarter of 2015, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 2.36% and 0.77%, respectively, and ranked in the 88th and 70th percentile among its peers, respectively.

- As of the end of the First Quarter of 2016, the Lazard Fund's 3-year return trailed its benchmark by 1.69% and ranked in the 76th percentile among its peers, while its 5-year return exceeded the benchmark and ranked in the 47th percentile. While the Fund's 5-year returns ranked slightly above the peer median and managed to beat the benchmark at each of the following three quarter-ends, its 3-year return never managed to come close to that of the benchmark or exceed the peer median.

- As of the end of the First Quarter of 2017, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 0.80% and 0.12%, respectively, and ranked in the 62nd and 55th percentile among its peers, respectively. Though the Fund's 5-year metrics had only just turned negative again, this was the *sixth consecutive quarter* that its 3-year returns had failed to beat the benchmark or rank above the peer median.

- As of the end of the Second Quarter of 2017, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 3.04% and 1.21%, respectively, and ranked in the 88th and 72nd percentile among its peers, respectively.

- As of the end of the Third Quarter of 2017, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 2.64% and 1.29%, respectively, and ranked in the 81st and 80th percentile among its peers, respectively.

- As of the end of the Fourth Quarter of 2017, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 2.30% and 1.52%, respectively, and ranked in the 74th and 78th percentile among its peers, respectively.

102.     At this point, consistent with their regular monitoring duties, the Committees should have reviewed at least *four consecutive quarters* of the disgraceful returns, and at least *nine straight quarters* of 3-year returns that were unable to either exceed the benchmark or finish

in the top half of emerging market funds.  This clear pattern was ignored, and the poor returns persisted and worsened, to the further detriment of participants:

- As of the end of the First Quarter of 2018, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 0.58% and 1.50%, respectively, and ranked in the 53rd and 74th percentile among its peers, respectively.

- As of the end of the Second Quarter of 2018, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 2.83% and 2.96%, respectively, and ranked in the 82nd and 85th percentile among its peers, respectively.

- As of the end of the Third Quarter of 2018, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 2.69% and 3.17%, respectively, and ranked in the 62nd and 88th percentile among its peers, respectively.

- As of the end of the Fourth Quarter of 2018, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 1.54% and 2.69%, respectively, and ranked in the 42nd and 85th percentile among its peers, respectively.

103.    At this point, the Committees should have observed at least *eight consecutive quarters* of the Lazard Fund's inability to beat the benchmark or beat the peer median on a rolling 5-year basis, and *thirteen consecutive quarters* of the Fund's failure to beat the benchmark on a rolling 3-year basis.  In that same thirteen quarter period, the Fund's 3-year returns failed to beat the median emerging market fund return twelve times.  Though the Lazard Fund should have been removed well before it was able to string together such a profound losing streak, Defendants let it sit in the Plan without any justifiable basis, stubbornly exposing participants wishing to invest in emerging markets equities to one of the worst such funds available:

- As of the end of the First Quarter of 2019, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 3.36% and 3.19%, respectively, and ranked in the 77th and 86th percentile among its peers, respectively.

- As of the end of the Second Quarter of 2019, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 4.07% and 3.31%, respectively, and ranked in the 80th and 91st percentile among its peers, respectively.

- As of the end of the Third Quarter of 2019, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 3.70% and 2.71%, respectively, and ranked in the 89th and 85th percentile among its peers, respectively.

- As of the end of the Fourth Quarter of 2019, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 4.62% and 2.45%, respectively, and ranked in the 90th and 80th percentile among its peers, respectively.

- As of the end of the First Quarter of 2020, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 6.54% and 3.23%, respectively, and ranked in the 91st and 85th percentile among its peers, respectively.

- As of the end of the Second Quarter of 2020, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 7.07% and 4.33%, respectively, and ranked in the 95th and 91st percentile among its peers, respectively.

- As of the end of the Third Quarter of 2020, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 8.87% and 5.67%, respectively, and ranked in the 98th and 91st percentile among its peers, respectively.

- As of the end of the Fourth Quarter of 2020, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 7.69% and 4.90%, respectively, and ranked in the 94th and 88th percentile among its peers, respectively.

- As of the end of the First Quarter of 2021, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 7.06% and 4.91%, respectively, and ranked in the 96th and 90th percentile among its peers, respectively.

- As of the end of the Second Quarter of 2021, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 4.97% and 5.71%, respectively, and ranked in the 90th and 92nd percentile among its peers, respectively.

- As of the end of the Third Quarter of 2021, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 3.34% and 4.70%, respectively, and ranked in the 88th and 96th percentile among its peers, respectively.

- As of the end of the Fourth Quarter of 2021, the Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 3.79% and 4.81%, respectively, and ranked in the 91st and 97th percentile among its peers, respectively.

104.    Though the Lazard Fund was ultimately replaced at some point after the end of the Fourth Quarter of 2020, it is worth noting that its shocking form has endured, providing further support for the conclusion that its dreadful performance while in the Plan lineup was not

an aberration but endemic and characteristic of the unsuitability of the Lazard Fund for the Plan. As of the four quarter-ends in 2021, the Fund's 3-year returns trailed the benchmark by between 3.34% and 7.06% while ranking between the 88th and 96th percentile; its 5-year returns alleged the benchmark by between 4.70% and 5.71% while ranking between the 90th and 97th percentile among peers.  Its performance throughout the Class Period, which was ignored until very recently, is displayed in the graphs below.





105.    The Lazard Fund's severe performance issues were apparent at the start of the

Class Period.  Again, when an investment option's track record is so apparently poor, prudent

fiduciaries should necessarily replace the fund with an alternative that has demonstrated the

ability to consistently outperform the benchmark, or, at the very least, retain an alternative that

tracks the benchmark.  By way of example and to illustrate, there is a Fidelity Emerging Markets

Index Fund that simply tracks the MSCI Emerging Markets Index, with a very low expense ratio

of 7.6 basis points (0.076%).  While participants should have had the option to achieve the

index's returns at minimal cost, Defendants' imprudence in retaining the Lazard fund instead

forced them to pay 108 basis points (1.08%) to consistently lag the index.

106.    Moreover, there were several other prudent and available actively managed

alternatives that Defendants could have selected for the Plan in place of the Lazard Fund

including, for example, the American Funds New World Fund ("New World") or the Fidelity

Emerging Markets Fund ("Fidelity EM").  At the start of the Class Period, at which point the

Lazard Fund's 3- and 5-year annualized returns trailed those of its benchmark by 2.36% and

0.77%, respectively, and ranked in the 88th and 70th percentile among emerging market funds,

respectively, the New World Fund's 3- and 5-year returns beat the benchmark and ranked in the

6th and 4th percentile, respectively, among that same peer group, and the Fidelity EM Fund's 3-

and 5-year returns also exceeded the benchmark and ranked in the 12th and 25th percentile,

respectively.  Both the New World and Fidelity EM Funds remained considerably better active

emerging market funds than the Lazard Fund throughout the Class Period.  Defendants' failure to

timely replace the Lazard Fund with better performing alternatives was a breach of fiduciary

duty.

### 4.      The Plan's Excessive Total Plan Cost[28]

107.      In another obvious breach of their fiduciary duties, Defendants also failed to monitor the average expense ratios charged by investment managers to similarly sized plans. Indeed, participants were offered an exceedingly expensive menu of investment options, clearly demonstrating that Defendants neglected to benchmark the cost of the Plan lineup or consider ways to lessen the fee burden on participants during the pertinent period.  From 2015 through 2020, the Plan paid investment-related fees (some of which was allocated to the Plan's recordkeeper, Fidelity) of 0.53% of its total assets, considerably more than those of comparable plans.  According to the most recent Brightscope/ICI study published in July 2021, the average TPC is 0.29% for plans with over $1 billion in assets,[29] such as the Plan.  The fact that the Plan was paying total fees that were up to 83% higher than the average total cost for comparable plans confirms the plain fact that Defendants failed to ensure the Plan was paying reasonable fees, an apparent and significant breach of  fiduciary duty.  Indeed, at all times, the Plan's TPC was 16 to 24 basis points (0.16%–0.24%) higher than what Defendants should have reasonably accepted,[30] causing the Plan to overpay approximately $15.9 million in fees from 2015 to 2020.  Plan participants bear this excessive fee burden.  Defendants' failure to recognize and remedy the Plan's excessive TPC harmed participants' ability to grow their retirement savings and represents a profound breach of fiduciary duty.

---

[28]Total plan cost ("TPC") refers to the sum of all fees and expenses associated with the operation of a retirement plan; notably, the recordkeeping fees, any other administrative fees, and investment management fees. The TPC permits a straight "apples-to-apples" comparison of the total fees incurred by different plans, as service providers can and do manipulate price reporting by shifting or redirecting their fees to investment management expenses to minimize the billing for recordkeeping and other service components, and vice versa.

[29]This figure is for 2018. Given technological advances and market-based competitive pressures since 2018, the average total plan cost should be even lower today.

[30]In 2015 and 2016, the Plan had approximately $839 million and $943 million in assets, respectively. Accordingly, for these years, Plaintiffs calculate the excess TPC using the average TPC for plans with between $500 million and $1 billion in assets (0.37%) from the Brightscope/ICI study.

108.    As long as Defendants continue to fill the Plan lineup with excessively expensive investment options, participants will suffer harm to their retirement savings through the payment of needless extra fees.  By failing to recognize that the Plan and its participants were paying higher investment related fees than they should have been and failing to take effective remedial actions, Defendants breached their fiduciary duties to the Plan.

## V.    ERISA'S FIDUCIARY STANDARDS

109.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  Section 404(a) of ERISA, 29 U.S.C. § 1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -
>
> (A)    for the exclusive purpose of
>
> > (i)    providing benefits to participants and their beneficiaries; and
> >
> > (ii)    defraying reasonable expenses of administering the plan;
>
> [and]
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

110.    Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in a plan and their beneficiaries and defraying reasonable expenses of administering the plan.

111.    Under ERISA, parties that exercise any authority or control over plan assets, including the selection of plan investments and service providers, are fiduciaries and must act prudently and solely in the interest of participants in a plan.

112.    ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants. *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n. 8 (2d Cir. 1982).

113.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  Section 405(a) of ERISA, 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.  ERISA states, in relevant part, as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)    if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

114.    Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under Section 409, 29 U.S.C. § 1109.  Section 409(a) of ERISA provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon

fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VI.   CLASS ALLEGATIONS

115.    This action is brought as a class action by Plaintiffs on behalf of themselves and the following proposed Class:

> All participants and beneficiaries in the Yale-New Haven Hospital and Tax Exempt Affiliates Tax Sheltered Annuity Plan at any time on or after January 21, 2016 and continuing to the date of judgment, or such earlier date that the Court determines is appropriate and just, including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

116.    This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

117.    **Numerosity**.  Plaintiffs are informed and believe that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

118.    **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiffs and all the members of the Class, including, but not limited to the following:

(a)    Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b)      Whether Defendants breached their fiduciary duties under ERISA by failing to

defray the reasonable expenses of administering the Plan; and

(c)      Whether and what form of relief should be afforded to Plaintiffs and the Class.

119.      **Typicality**.  Plaintiffs, who are members of the Class, have claims that are typical

of all the members of the Class.  Plaintiffs' claims and all the Class members' claims arise out

of the same uniform course of conduct by Defendants and arise under the same legal theories

that are applicable as to all other members of the Class.  In addition, Plaintiffs seek relief for the

Plan under the same remedial theories that are applicable as to all other members of the Class.

120.      **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent the

interests of the members of the Class.  Plaintiffs have no conflicts of interest with other

members of the Class or interests that are any different from the other members of the Class.

Plaintiffs have retained competent counsel experienced in class action and other complex

litigation, including class actions under ERISA.

121.      **Potential Risks and Effects of Separate Actions**.  The prosecution of separate

actions by or against individual Class members would create a risk of: (A) inconsistent or

varying adjudications with respect to individual Class members that would establish

incompatible standards of conduct for the party opposing the Class; or (B) adjudications with

respect to individual class members that, as a practical matter, would be dispositive of the

interests of the other members not parties to the individual adjudications or would substantially

impair or impede their ability to protect their interests.

122.      **Predominance**.  Common questions of law and fact predominate over questions

affecting only individual Class members, and the Court, as well as the parties, will spend the

vast majority of their time working to resolve these common issues.  Indeed, virtually the only

individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

123.   **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority of, if not all, Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

124.   **Manageability**.  This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

125.   Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

126.   Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of

Civil Procedure.  Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

127.    Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1) and/or 23(b)(3) of the Federal Rules of Civil Procedure.

**COUNT I**
**(For Breach of Fiduciary Duty)**

128.    Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

129.    Defendants' conduct, as set forth above, violates their fiduciary duties under Sections 404(a)(1)(A), (B) and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

130.    To the extent that any of the Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they, or it was a co-fiduciary and knowingly participated in, or concealed, a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their, or its specific responsibilities giving rise to

his, her, their, or its fiduciary status, or knowingly failed to cure a breach of fiduciary duty by another fiduciary and failed to take reasonable efforts to remedy the breach.

131.    As a direct result of Defendants' breaches of duties, the Plan has suffered losses and damages.

132.    Pursuant to Sections 409 and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs, and other recoverable expenses of litigation.

## COUNT II
### (Failure to Monitor Fiduciaries and Co-Fiduciary Breaches)

133.    Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

134.    Yale-NH Hospital is responsible for appointing, overseeing, and removing members of the Administrative Committees, who, in turn, are responsible for appointing, overseeing, and removing members of the Committees.

135.    In light of its appointment and supervisory authority, Yale-NH Hospital had a fiduciary responsibility to monitor the performance of the Committees and their members.  In addition, Yale-NH Hospital and the Administrative Committees had a fiduciary responsibility to monitor the performance of the members of the Committees.

136.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

137.    To the extent that fiduciary monitoring responsibilities of Yale-NH Hospital or the Committees was delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

138.    Yale-NH Hospital and the Committees breached their fiduciary monitoring duties by, among other things:

(a)   Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

(b)   Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

(c)   Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and its participants' retirement savings.

139.    As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses.  Had Yale-NH Hospital and the Committees discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

140.    Yale-NH Hospital and the Committees are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are

subject to other equitable or remedial relief as appropriate.

141.    Each of the Defendants also knowingly participated in the breaches of the other

Defendants, knowing that such acts constituted breaches; enabled the other Defendants to

commit breaches by failing to lawfully discharge their own fiduciary duties; and knew of the

breaches by the other Defendants and failed to make any reasonable effort under the

circumstances to remedy the breaches. Defendants, thus, are liable for the losses caused by the

breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III
### (In the Alternative, Liability for Knowing Breach of Trust)

142.    Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint

as if fully set forth herein.

143.    In the alternative, to the extent that any of the Defendants are not deemed a

fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise

subject to equitable relief as a non-fiduciary from further participating in a knowing breach of

trust.

144.    To the extent any of the Defendants are not deemed to be fiduciaries and/or are

not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants

are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge

and information to avoid the fiduciary breaches at issue here and knowingly participated in

breaches of fiduciary duty by permitting the Plan to offer a menu of imprudent investment

options and pay excessive recordkeeping and administrative fees, all of which was unjustifiable

in light of the size and characteristics of the Plan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class and the Plan, demand

judgment against Defendants for the following relief:

(a)    Declaratory and injunctive relief pursuant to Section 502 of ERISA, 29 U.S.C. §

1132, as detailed above;

(b)    Equitable, legal or remedial relief to return all losses to the Plan and/or for

restitution and/or damages as set forth above, plus all other equitable or remedial relief as

the Court may deem appropriate pursuant to Sections 409 and 502 of ERISA, 29 U.S.C.

§§ 1109 and 1132;

(c)    Pre-judgment and post-judgment interest at the maximum permissible rates,

whether at law or in equity;

(d)    Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)    Such further and additional relief to which the Plan may be justly entitled and the

Court deems appropriate and just under all of the circumstances.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of Section 502(h) of ERISA, 29 U.S.C. §

1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this

Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified

mail, return receipt requested.

DATED: May 6, 2022                    Respectfully submitted,

                                      /s/ Laurie Rubinow
                                      James E. Miller
                                      Laurie Rubinow
                                      Miller Shah LLP
                                      65 Main Street
                                      Chester, CT 06412
                                      Telephone: (866) 540-5505
                                      Facsimile: (866) 300-7367
                                      Email: jemiller@millershah.com
                                              lrubinow@millershah.com

James C. Shah
Alec J. Berin
Miller Shah LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
ajberin@millershah.com

Kolin C. Tang
Miller Shah LLP
19712 MacArthur Blvd.
Irvine, CA 92612
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: kctang@millershah.com

Mark K. Gyandoh
Gabrielle P. Kelerchian
Capozzi Adler, P.C.
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-0200
Facsimile: (717) 233-4103
Email: markg@capozziadler.com
gabriellek@capozziadler.com

Donald R. Reavey
Capozzi Adler, P.C.
2933 North Front Street
Harrisburg, PA 17110
Telephone: (717) 233-4101
Facsimile: (717) 233-4103
Email: donr@capozziadler.com

*Attorneys for Plaintiffs, the Plan
and the Proposed Class*