**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KAITY RUILOVA, et al., | |
| Plaintiffs, | |
| | Civil Action No. 3:22-cv-00111-MPS |
| v. | |
| YALE-NEW HAVEN HOSPITAL, INC., et al., | June 10, 2022 |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 4

    I.    Plaintiffs, Defendants, and Plan Structure ................................................ 4

    II.   Plaintiffs' Claims and Supporting Facts .................................................... 4

        A.   The Plan's Imprudent Investment Options ......................................... 4

        B.   The Plan's Significantly-Above-Average Total Expenses .................. 9

        C.   The Plan's Excessive Recordkeeping and Administrative Costs ....... 10

LEGAL STANDARDS ........................................................................................... 11

ARGUMENT .......................................................................................................... 13

    I.    Plaintiffs Plausibly State a Claim Regarding the Plan's RK&A Fees. ........... 13

        A.   Defendants Attempt to Mislead the Court Regarding the Plan's RK&A Fees. ............. 14

        B.   Plaintiffs Sufficiently Allege Appropriate Comparators for the Plan's RK&A Services and Fees. ............................................................ 16

    II.   Plaintiffs Plausibly State an Imprudence Claim Regarding the Freedom Funds. .............. 18

        A.   Comparison of the Freedom Funds to the Index Suite is Appropriate. ........................... 19

        B.   Plaintiffs' Allegations Regarding the Freedom Funds' Underlying Investments Are Well-Pled. ..................................................... 23

        C.   Plaintiffs' Comparisons to Other Target Date Funds Support Their Imprudence Claim Regarding the Freedom Funds. ........................ 24

    III.   Plaintiffs Plausibly State an Imprudent Claim as to the Plan's Other Investments. ...... 27

        A.   Plaintiffs Sufficiently Allege Underperformance. ............................ 27

        B.   Plaintiffs Allege Appropriate Comparators ...................................... 29

    IV.   Plaintiffs Plausibly State an Imprudence Claim Regarding the Plan's Investment Menu

as a Whole. ................................................................................................................ 31

V.   Plaintiffs Plausibly State a Claim for Breach of the Duty of Loyalty. ............................. 32

VI.   Plaintiffs' Derivative and Alternative Claims Succeed................................................. 33

VII.   Plaintiffs Plausibly Allege that the Board, Individual Board Members, and Individual

Committee Members are Fiduciaries. ........................................................................ 36

VIII.   Plaintiffs Have Standing to Challenge All Funds ........................................................ 38

CONCLUSION................................................................................................................ 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraha v. Colonial Parking, Inc.*,
   243 F. Supp. 3d 179 (D.D.C. 2017) ......................................................... 32

*Allison v. L Brands, Inc.*,
   2021 WL 4224729 (S.D. Ohio Sept. 16, 2021) ...................................... 17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................ 11

*Boley v. Universal Health Servs., Inc.*,
   ___ F. 4th ___2022 WL 1768984 (3d Cir. June 1, 2022) ....................... 37

*Bouvy v. Analog Devices, Inc.*,
   2020 WL 3448385 (S.D. Cal. June 24, 2020) .......................................... 3

*Braden v. Wal-Mart Stores, Inc.*,
   588 F.3d 585 (8th Cir. 2009) ..........................................................*Passim*

*Carrigan v. Xerox Corp.*,
   2022 WL 1137230 (D. Conn. Apr. 18, 2022) ............................. 11, 16, 17

*Cassell v. Vanderbilt Univ.*,
   285 F. Supp. 3d 1056 (M.D. Tenn. 2018) ..................................... 3, 13, 15

*Cassell v. Vanderbilt Univ.*,
   2018 WL 5264640 (M.D. Tenn. Oct. 23, 2018) ...................................... 37

*Coulter v Morgan Stanley & Co. Inc.*,
   753 F3d 361 (2d Cir. 2014) ..................................................................... 35

*Cunningham v. Cornell Univ.*,
   2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019) .................................. 23, 26

*Cunningham v. Cornell Univ.*,
   2018 WL 4279466 (S.D.N.Y. Sept. 6, 2018) .......................................... 33

*Cunningham v. Cornell Univ.*,
   2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) ........................... 19, 28, 33

*Cutrone v. Allstate Corp.*,
  2021 WL 4439415 (N.D. Ill. Sept. 28, 2021) ................................................. 3

*Dardaganis v. Grace Cap. Inc.*,
  889 F.2d 1237 (2d Cir. 1989) ....................................................................... 36

*DiFelice v. U.S. Airways, Inc.*,
  497 F.3d 410 (4th Cir. 2007) ........................................................................ 23

*Disselkamp v. Norton Healthcare, Inc.*,
  2019 WL 3536038 (W.D. Ky. Aug. 2, 2019) ............................................... 27

*Falberg v. Goldman Sachs Group, Inc.*,
  2020 WL 3893285 (S.D.N.Y. July 9, 2020) .......................................... 3, 27, 32, 37

*Fallick v. Nationwide Mut. Ins. Co.*,
  162 F.3d 410 (6th Cir. 1998) ........................................................................ 13

*Feinberg v. T. Rowe Price Group, Inc.*,
  2018 WL 3970470 (D. Md. Aug. 20, 2018) .................................................. 3

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409 (2014) ......................................................................... 26, 29, 30

*Fountain v. Karim*,
  838 F.3d 129 (2d Cir. 2016) ......................................................................... 12

*Garthwait v. Eversource Energy Co.*,
  2021 WL 4441939 (D. Conn. Sept. 28, 2021) ....................................*Passim*

*Garthwait v. Eversource Energy Co.*,
  2022 WL 1657469 (D. Conn. May 25, 2022) ......................................... 37, 38

*Hay v. Gucci Am., Inc.*,
  2018 WL 4815558 (D.N.J. Oct. 3, 2018) ..................................................... 37

*Henderson v. Emory Univ.*,
  252 F. Supp. 3d 1344 (N.D. Ga. 2017).................................................... 3, 32

*Hughes v. Nw. Univ.*,
  142 S. Ct. 737 (2022)......................................................... 13, 22, 29, 30

*In re Biogen, Inc. ERISA Litig.*,
  2021 WL 3116331 (D. Mass. July 22, 2021) ......................................*Passim*

*In re Citigroup ERISA Litig.*,
  662 F.3d 128 (2d Cir. 2011) .......................................................................... 12, 21

*In re LinkedIn ERISA Litig.*,
  2021 WL 5331448 (N.D. Cal. Nov. 16, 2021) ................................................. 19, 21

*In re M&T Bank Corp. ERISA Litig.*,
  2018 WL 4334807 (W.D.N.Y. Sept. 11, 2018) ................................................. 33, 34

*In re MedStar ERISA Litig.*,
  2021 WL 391701 (D. Md. Feb. 4, 2021) .......................................................... 19, 25

*In re Morgan Stanley ERISA Litig.*,
  696 F Supp 2d 345 (S.D.N.Y. 2009) ................................................................ 35

*In re Omnicom ERISA Litig.*,
  2021 WL 3292487 (S.D.N.Y. Aug. 2, 2021) .................................................... 16, 19

*In re Quest Diagnostics Inc. ERISA Litig.*,
  2021 WL 1783274 (D.N.J. May 4, 2011) .................................................... 21, 22, 25

*In re Sprint Corp. ERISA Litig.*,
  2004 WL 2182186 (D. Kan. Sept. 24, 2004) .................................................... 34

*In re Unisys Sav. Plan Litig.*,
  74 F.3d 420 (3d Cir. 1996) .............................................................................. 26

*Johnson v. Providence Health & Servs.*,
  2018 WL 1427421 (W.D. Wash. Mar. 22, 2018) ............................................ 3, 31

*Jones v. Coca-Cola Consol., Inc.*,
  2021 WL 1226551 (W.D.N.C. Mar. 31, 2021) ................................................ 19, 22

*Karg v. Transamerica Corp.*,
  2019 WL 3938471 (N.D. Iowa Aug. 20, 2019) ............................................... 26

*Kruger v. Novant Health, Inc.*,
  131 F. Supp. 3d 470 (M.D.N.C. 2015) ............................................................ 14, 32

*La Liberte v. Reid*,
  966 F.3d 79 (2d Cir. 2020) .............................................................................. 11

*Leber v. Citigroup 401(k) Plan Inv. Comm.*,
  323 F.R.D. 145 (S.D.N.Y. 2017) ...................................................................... 12

*Letner v. Unum Life Ins. Co. of Am.*,
　203 F. Supp. 2d 1291 (N.D. Fla. 2001) ................................................................. 2

*Lujan v. Defenders of Wildlife*,
　504 U.S. 555 (1992) ............................................................................................. 12

*Main v. Amr. Airlines*,
　248 F. Supp. 3d 786 (N.D. Tex. 2017) ................................................................. 3

*Mass. Mut. Life Ins. Co. v. Russell*,
　473 U.S. 134 (1985) ............................................................................................. 38

*Miller v. Autozone, Inc.*,
　2020 WL 6479564 (W.D. Tenn. Sept. 18, 2020) ........................................... 14, 20

*Moitoso v. FMR LLC*,
　451 F. Supp. 3d 189 (D. Mass. 2020) .................................................................. 14

*Morin v. Essentia Health*,
　2017 WL 4876281 (D. Minn. Oct. 27, 2017) ...................................................... 32

*Patterson v. Morgan Stanley*,
　2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ........................................................ 37

*Pegram v. Herdrich*,
　530 U.S. 211 (2000) ................................................................................. 1, 29, 31

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan
　Stanley Inv. Mgmt. Inc.*, 712 F.3d 705 (2d Cir. 2013) .....................................*Passim*

*Peterson v. Ins. Servs. Office, Inc.*,
　2021 WL 1382168 (D.N.J. Apr. 13, 2021) ........................................................... 13

*Pinnell v. Teva Pharms. USA, Inc.*,
　2020 WL 1531870 (E.D. Pa. Mar. 31, 2020) .................................................... 3, 32

*Ramos v. Banner Health*,
　461 F. Supp. 1067 (D. Colo. 2020) ...................................................................... 23

*Rothstein v. Am. Int'l Grp., Inc.*,
　837 F.3d 195 (2d Cir. 2016) ................................................................................... 1

*Sacerdote v. New York Univ.*,
　9 F.4th 95 (2d Cir. 2021) ....................................................................................... 18

*Sacerdote v. New York Univ.*,
   2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017)................................................................ 14

*Sandoval v. Exela Enter. Sols., Inc.*,
   2020 WL 9259108 (D. Conn. Mar. 30, 2020) ...................................................... 11, 13

*Schultz v. Edward D. Jones & Co., L.P.*,
   2018 WL 1508906 (E.D. Mo. Mar. 27, 2018) ........................................................... 3

*Sphere Digital, LLC v. Armstrong*,
   2020 WL 6064156 (S.D.N.Y. Oct. 14, 2020) ............................................................ 11

*Sweda v. Univ. of Penn.*,
   923 F.3d 320 (3d Cir. 2019) ........................................................................... 11, 27

*Thole v. U.S. Bank N.A.*,
   140 S. Ct. 1615 (2020)..................................................................................... 12

*Tibble v. Edison Int'l*,
   575 U.S. 523 (2015) ...................................................................................... 10

*Tibble v. Edison Int'l*,
   843 F.3d 1187 (9th Cir. 2016) ...................................................................... 13, 30

*Troudt v. Oracle Corp.*,
   2017 WL 1100876 (D. Colo. Mar. 22, 2017) .......................................................... 3

*Tussey v.  ABB, Inc.*,
   746 F.3d 327 (8th Cir. 2014) ............................................................................ 32

*Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*,
   2016 WL 4507117 (C.D. Cal. Aug. 5, 2016) ......................................................... 37

*Vellali v. Yale Univ.*,
   308 F. Supp. 3d 673 (D. Conn. 2018)............................................... 3, 15, 16, 17

*White v. Chevron Corp.*,
   2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ...................................................... 13

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
   325 F. App'x 31 (2d Cir. 2009) ........................................................................ 17

**Statutes**

29 U.S.C. § 1104(a)(1).................................................................................................. 1, 2, 30

29 U.S.C. § 1104(a)(1)(A) ............................................................................................. 31

29 U.S.C. § 1104(a)(1)(B) .......................................................................................... 1, 10

Conn. Gen. Stat. Ann. § 33-1100................................................................................... 35

**Rules**

Fed. R. Civ.  P. 8(d)(2).................................................................................................. 34

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) ............................................... 3

**Other Authorities**

Restatement (Third) of Trusts § 90 ............................................................................... 13

Plaintiffs, Kaity Ruilova and Eileen Brannigan (collectively, "Plaintiffs"), individually and on behalf of the Yale-New Haven Hospital and Tax Exempt Affiliates Tax Sheltered Annuity Plan (the "Plan"), by and through their attorneys, respectfully submit this opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("Motion") (ECF No. 59) and the Memorandum of Law in Support of their Motion to Dismiss incorporated therein (ECF Nos. 37-1, 39-1).[1]

## INTRODUCTION

The Employee Retirement Income Security Act of 1974 ("ERISA") imposes strict fiduciary duties of loyalty and prudence upon retirement plan fiduciaries, which courts have recognized as "the highest duties known to the law." *Rothstein v. Am. Int'l Grp., Inc.*, 837 F.3d 195, 208 (2d Cir. 2016). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), with an "eye single" to the interests of such participants and beneficiaries. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). In addition, fiduciaries must exercise appropriate "care, skill, prudence, and diligence[.]" 29 U.S.C. § 1104(a)(1)(B). In this case, Defendants failed to satisfy the fiduciary duties they owed to the Plan and its participants and beneficiaries by imprudently selecting and monitoring Plan investments and causing the Plan to pay plainly excessive recordkeeping and investment management fees.

Defendants attempt to distract from Plaintiffs' well-pled allegations with banalities, like

---

[1] The Memorandum of Law in Support of Defendants' Motion to Dismiss is referred to herein as "MOL." The Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 59-1) is referred to as "MOL-AC ." The Amended Class Action Complaint (ECF No. 56) is referred to as the "AC" or "Amended Complaint." Defendants in this action are Yale-New Haven Hospital, Inc. ("YNHH"), the Board of Trustees of Yale New Haven Hospital, Inc. ("Board"), individual members of the Board, the System Investment Committee of Yale New Haven Health Services Corporation and System Affiliates, and the Retirement Committee of Yale New Haven Health Services Corporation and System Affiliates ("Committees"), and individual members of the Committees (collectively, "Defendants").

the unremarkable fact that YNHH voluntarily established the Plan.  MOL at 1.  But most ERISA-governed plans are voluntarily established, and the statute requires that, once a plan is established, its fiduciaries must adhere to the duties of prudence and loyalty.  29 U.S.C. § 1104(a)(1); *see Letner v. Unum Life Ins. Co. of Am.*, 203 F. Supp. 2d 1291, 1296 (N.D. Fla. 2001) ("Once an employer voluntarily establishes a plan, Congress' intent was to ensure that its employees would actually receive the promised benefits.").

Similarly, Defendants' contention that the Complaint is "a cookie-cutter version of complaints filed in near-identical lawsuits against other large hospital systems," MOL at 1, is a red herring.  Plaintiffs plead compelling claims for breaches of fiduciary duties and related misconduct against Defendants, the effects of which are exacerbated as Americans "continue to grapple with the health and economic challenges associated with the pandemic," facing depleted savings and rampant inflation, which render retirement assets more essential than ever.  *See id.* It defies reason to suggest that Defendants are somehow immune from liability because fiduciaries of other plans engaged in the same misconduct.  Indeed, the Fidelity Freedom Funds ("Freedom Funds"), a series of target date funds ("TDFs")[2] were among the first TDF suites available to investors, and thus benefitted significantly from their tenure as TDFs subsequently grew in popularity.  But incumbency, though it may drive popularity, *see* MOL at 5-6, is not a reliable indicator of quality, and as the excessive risk, cost, and consistent underperformance of the Freedom Funds has grown more apparent over the last decade, prudent retirement plans have abandoned the Freedom Funds.  *See* AC ¶¶ 72, 78.

---

[2] A TDF offers investors an "all-in-one retirement solution" as the portfolio of underlying funds is designed to gradually shift to take more conservative positions as the target retirement year approaches.  This "set it and forget it" investment option has proved to be very popular with less sophisticated investors.  AC ¶¶ 58, 63, 74.

Defendants challenge the sufficiency of the claims asserted in the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), but their arguments transparently mischaracterize both facts and law. As the Second Circuit has recognized, plaintiffs in ERISA cases often "lack the inside information necessary to make out their claims in detail unless and until discovery commences," and therefore they must rely on "circumstantial factual allegations" to support their claims. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.* ("*PBGC*"), 712 F.3d 705, 718 (2d Cir. 2013). Such circumstantial factual allegations are sufficiently pled in the Amended Complaint, and include the Plan's retention of the Freedom Funds, a troubled TDF suite that has been the subject of significant criticism and capital flight since a strategic restructure in 2013 and 2014; the Plan's selection and retention of other unsuitable investment alternatives; and the Plan's excessively high recordkeeping and investment management expenses. In fact, district courts from every circuit have denied similar motions to dismiss analogous claims pled with the degree of detail and specificity in the Complaint.[3] The Court should deny Defendants' meritless Motion in its entirety.

---

[3] *See, e.g.*, *In re Biogen, Inc. ERISA Litig.*, 2021 WL 3116331, at *3 (D. Mass. July 22, 2021); *Falberg v. Goldman Sachs Group, Inc.*, 2020 WL 3893285, at *11 (S.D.N.Y. July 9, 2020); *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673 (D. Conn. 2018); *Pinnell v. Teva Pharms. USA, Inc.*, 2020 WL 1531870, at *6 (E.D. Pa. Mar. 31, 2020); *Feinberg v. T. Rowe Price Group, Inc.*, 2018 WL 3970470, at *7 (D. Md. Aug. 20, 2018); *Main v. Amr. Airlines*, 248 F. Supp. 3d 786, 794 (N.D. Tex. 2017); *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1061 (M.D. Tenn. 2018); *Cutrone v. Allstate Corp.*, 2021 WL 4439415, at *9 (N.D. Ill. Sept. 28, 2021); *Schultz v. Edward D. Jones & Co., L.P.*, 2018 WL 1508906, at *3 (E.D. Mo. Mar. 27, 2018); *Bouvy v. Analog Devices, Inc.*, 2020 WL 3448385 (S.D. Cal. June 24, 2020); *Johnson v. Providence Health & Servs.*, 2018 WL 1427421, at *6 (W.D. Wash. Mar. 22, 2018); *Troudt v. Oracle Corp.*, 2017 WL 1100876, at *3 (D. Colo. Mar. 22, 2017); *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1349 (N.D. Ga. 2017).

## BACKGROUND

### I.       Plaintiffs, Defendants, and Plan Structure

Plaintiffs are former participants in the Plan, a qualified tax-deferred defined contribution retirement plan.  AC ¶¶ 2, 9–10.  As defined contribution plans have become the primary form of retirement savings in the United States, every penny saved matters.  *Id.* ¶ 2.  The Plan is one of the largest defined contribution plans in the United States, with 26,416 participants and assets totaling approximately $1.66 billion by the end of 2020.  *Id.* ¶ 4.  Plans with such substantial assets and participant counts have significant bargaining power and the ability to demand low-cost administrative and investment management services in the marketplace.  *Id.*

YNHH is the Plan sponsor and a fiduciary charged with administering the Plan.  *Id.* ¶¶ 5, 11.  The Board assembled the Committees and tasked the members, all of whom are also Plan fiduciaries, with administering the Plan on YNHH's behalf.  *Id.* ¶¶ 12–14.  Defendants contracted with Fidelity Management Trust Company (together with affiliated entities, "Fidelity") to serve as the Plan's trustee and recordkeeper.  *Id.* ¶¶ 22, 49.  The Plan pays its expenses from Plan assets, predominantly as a reduction of participants' investment income.  *Id.* ¶ 19.

### II.      Plaintiffs' Claims and Supporting Facts

Plaintiffs allege Defendants breached their fiduciary duties to prudently and loyally manage and monitor the Plan's investments, and recordkeeping and other administrative costs. These claims are amply supported by the allegations set forth in the Amended Complaint and summarized below.

#### A.       The Plan's Imprudent Investment Options

***The Freedom Funds.***  Among other investments, the Plan lineup includes the Freedom

Funds, a suite of fourteen TDFs managed by Fidelity.  Fidelity offers two versions of the Freedom Funds, a risker and more expensive series which invests in actively managed mutual funds, and the Fidelity Freedom Index Funds ("Freedom Index Funds"), which invest in funds that simply track market indices.  The two fund families have the same investment management company and team, and have a nearly identical glide path.[4]  *Id.* ¶¶ 59, 61, 64-65.  While it is a basic principle of investment theory that an investment is only rational if the risks are justified by the potential return, the Freedom Funds, which held approximately 56% of the Plan's assets by December 2020 (in large part due to the suite's role as the Plan's Qualified Default Investment Alternative) does not satisfy this basic principle.  *Id.* ¶¶ 62–63.

In 2013 and 2014 the Freedom Funds underwent a strategy overhaul, authorizing the investment managers to deviate from the glide path allocations by 10%, thereby increasing the portfolio's exposure to market volatility.  *Id.* ¶¶ 72–73.  Since this strategy overhaul, and in particular as of the start of the Class Period, the Freedom Funds and most of the suite's components have consistently underperformed several of the most popular readily investable alternatives in the TDF marketplace.  *Id.* ¶¶ 79-81.  The strategy overhaul and subsequent underperformance did not go unnoticed to the investing public, including other 401(k) plans, and the Freedom Funds suffered $16 billion in net outflows between 2014 and 2018.  *Id.* ¶ 78.  In fact, in March 2018, Reuters published a scathing special report (the "Reuters Report") detailing the Freedom Funds' issues.[5]  *Id.* ¶ 72.

---

[4] A glide path refers to a fund's allocation shifts over time.

[5] Tim McLaughlin & Renee Dudley, *Special Report: Fidelity Puts 6 Million Savers on Risky Path to Retirement*, REUTERS, Mar. 5, 2018, https://www.reuters.com/article/us-funds-fidelity-retirement-specialrep/special-report-fidelityputs-6-million-savers-on-risky-path-to-retirement-idUSKBN1GH1SI.

Plaintiffs allege that Defendants breached their fiduciary duties by failing to compare the Freedom Funds and Freedom Index Funds, as well as other readily available TDFs.  Plaintiffs maintain that a simple weighing of the benefits of these other funds would have indicated that the Freedom Funds were not suitable and prudent investment alternatives for the Plan, *id.* ¶¶ 85-86.

***The Parnassus Core Equity Fund.***  The Parnassus Core Equity Fund ("Parnassus Fund") consistently and significantly underperformed its benchmark, the S&P 500 Index, on a rolling three- and five-year annualized basis.  *Id.* ¶ 83.  Due to the Committees' deficient investment review procedures, at their regular meetings during the Class Period, they ignored or failed to recognize the Parnassus Fund's pattern of underperformance.  *Id*. ¶¶ 83-85.  The Parnassus Fund's persistent inability to beat its benchmark over periods most closely approximating a market cycle should have raised concerns for any fiduciary engaging in a prudent investment monitoring process.  *Id.* ¶ 85.  The Committees' retention of such an underperforming U.S. large cap fund, particularly in light of Morningstar's 2018 conclusion that long term success rates (meaning an actively managed fund's ability to survive and outperform an index fund tracking its benchmark over longer time horizons), were lowest among U.S. large cap funds, is further indication of the absence of a prudent process.  *Id.* ¶ 86.  If Defendants were intent on offering an actively managed U.S. large cap blend fund in the Plan investment menu, participants would have been better served by, for example, the Jensen Quality Growth Fund or JPMorgan Equity Focus Fund, both of which generated three- and five-year returns that consistently beat the S&P 500 Index and ranked among the highest of all domestic large cap blend funds.  *Id*. ¶ 87.

***The Invesco Diversified Dividend Fund.***  Likewise, the Invesco Diversified Dividend Fund ("Invesco Fund") consistently and significantly underperformed its benchmark, the Russell 1000 Value Index, and ranked in the bottom half of its peer group on a rolling three- and five-

year annualized basis.  *Id.* ¶ 88.  The Committees again neglected to follow a prudent investment evaluation process and ignored this negative trend.  *Id.*  Beginning as of the end of the Fourth Quarter of 2017, the Invesco Fund's three-year returns trailed those of the benchmark for the next 17 consecutive quarters, while its five-year returns lagged the benchmark for all but one of those same 17 quarters.  *Id.* ¶¶ 88-90.  Moreover, during the same period, the fund's three-year returns ranked in the bottom half of all large cap value funds for 17 consecutive quarters, while its five-year returns ranked below the peer median for 13 of those 17 quarters.  *Id.*  Despite having access to this returns data in real time, and despite the availability of several other prudent, superior actively managed alternatives that Defendants could have selected for the Plan, including the Columbia Dividend Income Fund and the Parnassus Endeavor Fund, the Committees failed to replace the underperforming Invesco Fund.  *Id.* ¶¶ 91–92.

**The AMG TimesSquare Mid Cap Growth Fund.**  Despite its unimpressive track record, the AMG TimesSquare Mid Cap Growth Fund ("AMG Fund") was added to the Plan menu at some point prior to December 31, 2019.  *Id.* ¶ 93.  The addition of this fund was illogical and inappropriate, considering it had consistently and significantly underperformed its benchmark, the Russell MidCap Growth Index, on a rolling three- and five-year annualized basis for at least the *previous sixteen quarters*.  *Id.*  Indeed, the AMG Fund regularly ranked in the bottom half of its peers prior to its selection.  *Id.* ¶ 94.  No prudent fiduciary armed with the foregoing performance information would have determined the AMG Fund to be an appropriate fit for the Plan, particularly given the availability of several other prudent, superior actively managed alternatives that Defendants could have selected for the Plan, including the Champlain Mid Cap Fund and the ClearBridge Select Fund.  *Id.* ¶ 95.

**The Fidelity High Income Fund.**  The Fidelity High Income Fund ("High Income

Fund") was yet another imprudent choice offered to Plan participants. This fund consistently and significantly underperformed its benchmark, the Intercontinental Exchange Bank of America Merrill Lynch U.S. High Yield/ U.S. High Yield Constrained Blend Index, on a rolling five- and ten-year annualized basis. *Id.* ¶ 96. Moreover, the High Income Fund failed to beat its benchmark in ten of the last eleven calendar years—information that, along with the fund's trailing returns, was readily available to Defendants in real time. *Id.* ¶ 97. Defendants should have been aware that, as of the start of the Class Period, the High Income Fund had failed to beat its benchmark in any of the preceding five calendar years, had five- and ten-year returns that displayed the Fund's inability to outperform the benchmark over longer periods, and ranked in the 70th percentile for three-year return and 62nd percentile for five-year return among other high yield bond funds. *Id.* ¶ 98. Despite the availability of several other prudent, superior actively managed alternatives that Defendants could have selected for the Plan, including the Fidelity Advisor High Income Advantage Fund and the PGIM High Yield Fund, the Committees failed to replace the underperforming High Income Fund with better performing alternatives. *Id.* ¶ 100.

    ***The Lazard Emerging Markets Equity Portfolio.*** While the Lazard Emerging Markets Equity Portfolio ("Lazard Portfolio") was replaced at some point after December 31, 2020, it exhibited severe performance issues as of the start of the Class Period which never abated, was an inappropriate investment option for the Plan, and should have been removed long before it ultimately was. *Id.* ¶¶ 101, 105. Indeed, by the end of the Fourth Quarter of 2015 (the first quarter-end prior to the start of the Class Period), the Lazard Portfolio's three- and five-year annualized returns trailed those of its benchmark, the MSCI Emerging Markets Index, and ranked in the 88th and 70th percentile among its peers, respectively. *Id.* ¶ 101. From this period

through the end of 2020, the portfolio's three-year returns lagged the benchmark for 21

consecutive quarters and ranked below the peer median as of 19 of those 21 quarters, while its

five-year returns trailed the benchmark and ranked in the bottom half of emerging market funds

in 17 of those 21 quarters.  *Id.* ¶¶ 101-103.   Yet this disturbing pattern was ignored until 2021 at

the earliest, despite Defendants' ability to access this returns data in real time, and despite the

availability of several other prudent, superior actively managed alternatives that Defendants

could have selected for the Plan, including the American Funds New World Fund and the

Fidelity Emerging Markets Fund.  *Id.* ¶ 106.

      For all these funds, Defendants had access to the data in the Complaint as well as data not

publicly available that should have alerted them to the funds' poor performance and the resulting

detrimental impact on participants' retirement savings.  Defendants had the ability and the duty

to replace these underperforming funds with more prudent investments that were better options

for the Plan and its participants.

      **B.**    **The Plan's Significantly-Above-Average Total Expenses**

      The Plan's investment options are also, as a whole, significantly more expensive than

those of similarly sized plans.  The Plan's excessive investment expense, combined with its

similarly excessive recordkeeping costs, is reflected in its total plan cost ("TPC")[6] of 0.53% of

total assets from 2015 to 2020.  *Id.* ¶ 107.  The average total plan expenses for similarly-sized

plans was 0.29% in 2018.  *Id.*  As a result, Plan participants bear this excessive fee burden, to the

---

[6] TPC refers to the sum of all fees and expenses associated with the operation of a retirement
plan, including the recordkeeping fees, any other administrative fees, and investment
management fees.  TPC permits a straight "apples-to-apples" comparison of the total fees
incurred by different plans, as service providers manipulate price reporting by shifting or
redirecting their fees to investment management expenses to minimize the billing for
recordkeeping and other service components, and vice versa.  AC ¶ 107 n.28

detriment of their ability to grow their retirement savings.  *Id.*

    **C.**    **The Plan's Excessive Recordkeeping and Administrative Costs**

During the Class Period, Plan participants paid Fidelity for recordkeeping and administrative ("RK&A") services indirectly through asset-based revenue sharing. *Id.* ¶ 49.  The RK&A services provided to the Plan were and are the same standard services provided to comparable plans.  *Id.*  In other words, Fidelity did not provide any services to the Plan that were unusual or out of the ordinary.  Regardless, for large plans like the Plan, any differences in services are immaterial to pricing considerations, the primary drivers of which are the number of participants and whether plan fiduciaries employed a competitive process of soliciting bids to determine the reasonable market rate for the services required.  *Id.*

Since the start of the Class Period, Defendants allowed the Plan to be charged total RK&A fees that far exceeded the reasonable market rate.  The Plan paid fees amounting to $63, $45, $37, $51, and $46 per participant for RK&A services for the years 2016, 2017, 2018, 2019, and 2020, respectively.  *Id.* ¶ 50.  Other similarly sized defined contribution plans during the Class Period paid significantly lower amounts for the same basket of services, ranging from $23 to $34 per participant.  *Id.* ¶¶ 52-54.  Several of these plans also used Fidelity as their recordkeeper, while others used different high quality national recordkeepers.  *Id.* ¶ 53.  Given the Plan's size and the ability of comparable plans to achieve lower fee arrangements, Defendants should have been able to obtain significantly lower RK&A fees.  *Id.* ¶ 51.  These facts are more than sufficient to support the inference that Defendants engaged in no examination or benchmarking of the Plan's RK&A fees and did not attempt to reduce them or bring them in line with the reasonable market rate.  *Id.* ¶ 56.

**LEGAL STANDARDS**

ERISA's duty of prudence requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  This standard applies to both the initial selection of an investment and the continuous monitoring of investments to remove imprudent ones.  *Tibble v. Edison Int'l*, 575 U.S. 523, 503 (2015).  A breach of fiduciary prudence may be alleged with circumstantial facts, as Plaintiffs have comprehensively done here.  *See PBGC*, 712 F.3d at 718 ("a claim alleging a breach of fiduciary duty may still survive a motion to dismiss . . . based on circumstantial factual allegations").

*Rule 12(b)(6).*  "To survive a motion to dismiss, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Sphere Digital, LLC v. Armstrong*, 2020 WL 6064156, at *4 (S.D.N.Y. Oct. 14, 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  While facial plausibility requires more than "labels and conclusions," it is not "'akin to a probability requirement,' nor does it require detailed factual allegations[.]'"  *Carrigan v. Xerox Corp.*, 2022 WL 1137230, at *3 (D. Conn. Apr. 18, 2022) (quoting *Iqbal*, 556 U.S. at 678).  Importantly, when assessing "a motion to dismiss under Rule 12(b)(6), the court liberally construes the claims, accepts the factual allegations in the Complaint as true, and draws all reasonable inferences in the non-movant's favor."  *Garthwait v. Eversource Energy Co.*, 2021 WL 4441939, at *4 (D. Conn. Sept. 28, 2021) (citing *La Liberte v. Reid*, 966 F.3d 79, 85 (2d Cir. 2020)).

ERISA's "remedial scheme counsels careful holistic evaluation of an ERISA complaint's factual allegations before concluding that they do not support a plausible inference that the

plaintiff is entitled to relief." *Sweda v. Univ. of Penn.*, 923 F.3d 320, 331 (3d Cir. 2019).  This is especially true in cases concerning breaches of fiduciary duty under ERISA where plaintiffs "generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009); *Sweda*, 923 F.3d at 331.  Therefore, claims for breach of fiduciary duty may "survive at the motion to dismiss stage 'if the complaint alleges facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment issue was improvident.'" *Garthwait*, 2021 WL 4441939, at *4 (quoting *PBGC*, 712 F.3d at 718).  State differently, breach of fiduciary duty claims are sufficient if the facts alleged indicate that a "prudent fiduciary in like circumstances would have acted differently." *Sandoval v. Exela Enter. Sols., Inc.*, 2020 WL 9259108, at *2 (D. Conn. Mar. 30, 2020) (citation omitted).  Of course, all these allegations "must be 'based upon information available to the fiduciary at the time . . . and not from the vantage point of hindsight.'" *PBGC*, 712 F.3d at 718 (quoting *In re Citigroup ERISA Litig.*, 662 F.3d 128, 141 (2d Cir. 2011)).

> ***Rule 12(b)(1).***  "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016).  To survive a standing challenge under Rule 12(b)(1), a plaintiff must establish: (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury was caused by the defendant; and (3) that the injury would likely be redressed by the requested judicial relief.  *See Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  An injury in fact requires "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not

conjectural or hypothetical." *Lujan*, 504 U.S. at 560.  "At the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice' to show a viable injury, 'for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Garthwait*, 2021 WL 4441939, at *3 (quoting *Lujan*, 504 U.S. at 561).

In the class action context, a named plaintiff has standing "if he alleges personal injury caused by the defendant and 'that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants.'" *In re Biogen, Inc. ERISA Litig.*, 2021 WL 3116331, at *3 (D. Mass. July 22, 2021) (quoting *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 154 (S.D.N.Y. 2017)).  A named ERISA plaintiff with standing "may seek relief . . . that sweeps beyond his own injury." *Braden*, 588 F.3d at 593; *see also Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998) (holding that "the standing-related provisions of ERISA were not intended to limit a claimant's right to proceed under Rule 23 on behalf of all individuals affected by the [fiduciary's] challenged conduct, regardless of the representative's lack of participation in all the ERISA-governed plans involved.").

## ARGUMENT

### I.     Plaintiffs Plausibly State a Claim Regarding the Plan's RK&A Fees.

It is well-established that any party operating in fiduciary capacity bears the "obligat[ion] to minimize costs." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (citing Unif. Prudent Inv. Act § 7).  Indeed, "[c]ost-conscious management is fundamental to prudence in the investment function." *Id.* at 1197–98 (quoting Restatement (Third) of Trusts § 90 cmt. b (2007)); *see also Hughes v. Nw. Univ.*, 142 S. Ct. 737, 741-42 (2022) (noting a fiduciary's

ongoing duty to monitor the prudence of plan fees and investments).  Plaintiffs clearly allege that

Defendants caused the Plan to incur excessive RK&A fees, and Defendants' attempts to muddy

Plaintiffs' fee claims and distance the Plan from Plaintiffs' apt comparators are unavailing.  *See*

MOL at 9.

**A.       Defendants Attempt to Mislead the Court Regarding the Plan's RK&A Fees.**

As a preliminary matter, and as illustrated by Defendants' proposed facts, *see* MOL at 10,

it should be noted that Courts routinely hold that disputes over the appropriate level of RK&A

fees present an "issue of fact [that] cannot be resolved at this stage of the litigation." *Sandoval*,

2020 WL 9259108, at *8; *Cassell*, 285 F. Supp. 3d at 1064 (same) (citing *White v. Chevron

Corp.*, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016)); *Peterson v. Ins. Servs. Office, Inc.*,

2021 WL 1382168, at *5 n.9 (D.N.J. Apr. 13, 2021) (same) (citation omitted); *Miller v.

Autozone, Inc.*, 2020 WL 6479564, at *10 (W.D. Tenn. Sept. 18, 2020) (recognizing "the need to

conduct discovery" on recordkeeping fees); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470,

479 (M.D.N.C. 2015) (same).  In any event, Plaintiff has plainly stated a claim based on the

Plan's excessive recordkeeping costs

Contrary to Defendants' contention, Plaintiffs correctly calculated and alleged the Plan's

per-participant recordkeeping fee amount based on the Plan's Form 5500s.  As explained above,

recordkeeping service providers, including Fidelity, often manipulate their price reporting when

it comes to recordkeeping and administrative fees.  AC ¶ 107 n.18.  However, all these fees are

paid by Plan participants, whether they are charged as "recordkeeping" or "administrative" fees,

which is why Plaintiffs set forth the total recordkeeping and administrative fees, not just the

contracted recordkeeping arrangement, for the Plan and proffered comparators.  *Id.* ¶ 53.

Moreover, Fidelity itself has previously acknowledged that its services are worth substantially

less than the Plan paid.  In *Moitoso v. FMR LLC*, Fidelity agreed that "the value of services would range from $14–$21 per person over the class period, and that the recordkeeping services provided by Fidelity to this [p]lan are not more valuable that those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper."  451 F. Supp. 3d 189, 199 (D. Mass. 2020); *see also Sacerdote v. New York Univ.*, 2017 WL 3701482, at *9 (S.D.N.Y. Aug. 25, 2017) (finding an excessive recordkeeping fee claim to be sufficient where plaintiffs alleged that experts in the industry determined the market rate for "administrative fees for plans like those at issue in this case as $35 per participant").  Here, the Plan has approximately $1.66 billion in assets, surpassing the threshold identified by Fidelity.

Further, Defendants are simply incorrect that that Plaintiffs do not account for the Plan's revenue sharing arrangement with Fidelity.  MOL at 11.  As Plaintiffs clearly explain, all the RK&A fees reported in the Amended Complaint contain all the direct or indirect (*i.e.*, revenue sharing) compensation paid to a plan's recordkeeper.  AC ¶ 54.  Even if Plaintiffs had not accounted for revenue sharing, the fact would remain that the Plan pays between $37 and $63 per participant in direct recordkeeping fees, while smaller and similarly sized plans achieved far lower per-participant fees.  *Id.* ¶¶ 50-53; *see Vellali*, 308 F. Supp. 3d at 685 ("defendants' arguments ignore the factual allegations in the Amended Complaint, which compares the general range of costs for a flat fee arrangement to estimates of the cost for the Plan's recordkeeping arrangement"); *Garthwait*, 2021 WL 4441939, at *9 (noting that a "majority of district courts in this Circuit . . . have denied motions to dismiss claims that fees were excessive and that fiduciaries failed to negotiate or seek lower fees" based on allegations that a plan's RK&A fees were higher than comparable plans).

Finally, the fact that the Plan's RK&A fees declined overtime does not indicate that

Defendants employed a prudent process, *see* MOL at 12, as Plaintiffs allege that the RK&A fees charged to Plan participants were too high *at all times* throughout the Class Period.  Moreover, although the per-participant fee fell from $63 to $45 to $37 in 2016, 2017, and 2018, the fee then jumped back up to $51 per participant in 2019, despite the Plan's steadily increasing participant count.  AC ¶ 50.  This see-saw pattern does not provide any reasonable basis to infer that Defendants acted reasonably to renegotiate the Plan's RK&A fees.  To the contrary, the facts Plaintiffs allege state a claim for breach of Defendants' duty to monitor administrative expenses. *See Cassell*, 285 F. Supp. 3d at 1064 (finding "[p]laintiffs here have alleged specific facts to support their claim that, based on the [p]lan's features, the nature of the administrative services provided by the [p]lan's record-keepers, the [p]lan's participant level, and the record-keeping market, [the plan's expenses were] outside the limit of a reasonable record-keeping fee" and that "[i]t is plausible from those facts to infer that [d]efendants could have obtained less expensive record-keeping services by soliciting competitive bids").

## B.   Plaintiffs Sufficiently Allege Appropriate Comparators for the Plan's RK&A Services and Fees.

This circuit has consistently denied motions to dismiss complaints alleging that a recordkeeper provided services for other comparable plans at a lower fee, as well as allegations showing RK&A fees are excessive compared to industry averages.  *In re Omnicom ERISA Litig.*, 2021 WL 3292487, at *15 (S.D.N.Y. Aug. 2, 2021) (holding that plaintiffs' allegations that the recordkeeper "charges a much lower rate to other, more comparable plans . . . is enough to get them past this motion to dismiss"); *Garthwait*, 2021 WL 4441939, at *8–9; *Vellali,* 308 F. Supp 3d at 685 (finding a complaint comparing "the general range of costs" for recordkeepers of similar plans sufficient to survive a motion to dismiss); *Carrigan*, 2022 WL 1137230, at *6 (holding allegations that comparably sized plans received recordkeeping services "at costs in the

range of $30 to $35 per participant per year . . . support a plausible inference that the process by

which the Committees hired the recordkeepers was flawed.").  As Plaintiffs here plead

allegations with the same level of detail, the Court should have no issue following the precedent

established by the district courts in this Circuit.

Defendants repeatedly challenge Plaintiffs' assertions concerning the level of service

Fidelity provided to the Plan, completely ignoring Plaintiffs' well-pled allegations that all

RK&A service providers offer the same bundle of services, priced according to participant count,

and that the RK&A services provided to the Plan were not unusual or extraordinary.  *See* MOL at

13 AC ¶¶ 26–36 49, 55.  Yet Defendants have no basis to suggest Fidelity may have performed

services in addition to the regular RK&A services it provides to virtually all plans in exchange

for the challenged fees, particularly given the totality of Plaintiffs' allegations concerning

Defendants' process deficiencies.  *See Vellali*, 308 F. Supp. 3d at 684 n.2 (declining to require

plaintiffs to specifically allege fees were excessive relative to the services rendered because of

the adequacy of the other allegations) (distinguishing *Young v. Gen. Motors Inv. Mgmt. Corp.*,

325 F. App'x 31 (2d Cir. 2009) (summary order)).

It is not Plaintiffs' burden at this juncture to disprove Defendants' unsupported assertions

that RK&A fees may have been priced on the basis of as-yet unspecified unique services or other

factors, and the Court may not draw that inference in favor of Defendants.  *See Braden*, 588 F.3d

at 596 ("[i]t is not [Plaintiffs'] responsibility to rebut these possibilities in [their] complaint,

however . . . [and] Rule 8 does not require a plaintiff to plead facts tending to rebut all possible

lawful explanations for a defendant's conduct"); *see generally Allison v. L Brands, Inc.*, 2021

WL 4224729, at *9 (S.D. Ohio Sept. 16, 2021) ("Plaintiff has alleged that Plan participants paid

recordkeeping fees significantly in excess of competitive terms for a period of at least six years,

when information was available to Plan fiduciaries that could have mitigated or avoided these losses, which establishes the reasonable inference of [imprudence]."). In other words, as another Court in this District recently held, "the relative sparsity of Plaintiff's allegations concerning the specific services rendered . . . is not fatal to their claim of excessive recordkeeping fees. Rather, Plaintiffs' general allegations that the comparator recordkeepers would have provided services 'of like or superior quality' . . . as well as Plaintiffs' suggestion that recordkeeping services are fairly standardized, support their claim that the fees charged by the affiliated recordkeepers were excessive." *Carrigan*, 2022 WL 1137230, at *8.

Defendants also appear to be under the impression that because Plaintiffs selected certain comparators with lower RK&A fees than the Plan, the remaining universe of plans somehow do not have lower fees. *See* MOL at 16. While this inference is clearly unsupportable, Plaintiffs emphasize that the plans identified in the Complaint were chosen for their similarity to the Plan in participant count and services obtained.[7] Defendants object that the comparators offered are not actually similar to the Plan, conveniently ignoring that all the plans have similar profiles, with four comparators having fewer participants and five having more than the Plan. AC ¶ 53. These plans were able to achieve RK&A fees significantly lower than the Plan's for the same basket of services. *Id.* ¶¶ 53–56. These allegations are more than sufficient to support Plaintiffs' excessive recordkeeping fee claims.

## II.   Plaintiffs Plausibly State an Imprudence Claim Regarding the Freedom Funds.

Instead of minding the instruction that complaints not be "parsed piece by piece to

---

[7] Defendants misrepresent the clear allegations in the Amended Complaint, claiming that Plaintiffs' figures are premised on fee comparisons to nine other plans for the single year of 2020. MOL at 15. While the Amended Complaint cites the Plan's 2020 Form 5500, Plaintiffs clarify, in no uncertain terms, that Defendants' imprudence with regard to excessive RK&A fees occurred throughout the entirety of the putative Class Period. AC ¶¶ 54–57.

determine whether each allegation, in isolation, is plausible," *Braden*, 588 F.3d at 594,

Defendants ask the Court to find that each of Plaintiffs' allegations, standing alone, is

insufficient to state a claim. The Court should readily decline this invitation.  Each of the

allegations in the Complaint support Plaintiffs' claims, and, properly taken together, they more

than plausibly state claims for breaches of fiduciary duties.  *See Sacerdote v. New York Univ.*, 9

F.4th 95, 107 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022) ("ERISA plaintiffs generally

lack the inside information necessary to make out their claims in detail unless and until discovery

commences.") (internal quotations omitted); *PBGC*, 712 F.3d at 718 (noting that ERISA

allegations are not required to "directly address" the plan management process).

A.      **Comparison of the Freedom Funds to the Index Suite is Appropriate.**

As a preliminary matter, courts in this Circuit and around the country have clarified that

disputes over benchmarks raise "factual questions that [are] not properly addressed on a motion

to dismiss." *Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *7 (S.D.N.Y. Sept. 29, 2017);

*see also Biogen*, 2021 WL 3116331, at *6 ("[d]isputes over the appropriateness of [] benchmarks

. . . are inappropriate at the motion to dismiss stage."); *In re MedStar ERISA Litig.*, 2021 WL

391701, at *6 (D. Md. Feb. 4, 2021) ("Courts have specifically held that the determination of the

appropriate benchmark for a fund is not a question properly resolved at the motion to dismiss

stage.").  More specifically, courts in this district and around the country have refused to find the

Freedom Index Funds to be an inappropriate comparator for the Freedom Funds at the pleadings

stage.  *See, e.g.*, *Omnicom*, 2021 WL 3292487, at *12 ("[a]t this stage, plaintiffs' allegations of

similarity make it at least plausible that the [Freedom Funds and Index Suite] will be found to be

comparable"); *In re LinkedIn ERISA Litig.*, 2021 WL 5331448, at *8 (N.D. Cal. Nov. 16, 2021)

("These allegations are sufficient at the pleading stage to create the inference that the Index Suite

could serve a suitable comparator for the Freedom Funds."); *Jones v. Coca-Cola Consol., Inc.*, 2021 WL 1226551 (W.D.N.C. Mar. 31, 2021) (similar).

Despite this clear reasoning, Defendants take issue with Plaintiffs' comparison of the Freedom Funds and Freedom Index Funds, alleging that the two TDF suites, notwithstanding their numerous material similarities, present an "apples-to-oranges" comparison.  MOL at 17. To the contrary, the Freedom Index Funds are a meaningful, if not ideal, benchmark for the Freedom Funds, as the two suites are managed by the same investment managers, who have implemented virtually identical glide paths across the two suits, and both suites were both readily available investment options for the Plan.  AC ¶¶ 59, 61.  In addition, given Fidelity's position as the Plan's recordkeeper and manager of the majority of the Plan's assets throughout the Class Period, Defendants likely were (and certainly should have been) aware of the Freedom Index Funds as a comparator and potential replacement for the Freedom Funds.

   i. <u>Plaintiffs Adequately Allege the Freedom Funds are Unsuitably Risky.</u>

The crucial distinction between the Freedom Funds and Freedom Index Funds is that the Freedom Funds' portfolio is comprised of funds designed to outperform market indices, while the underlying funds in the Freedom Index Funds track certain market indices.  AC ¶ 61.  Akin to a control (Freedom Index Funds) and variable (Freedom Funds), any outperformance or underperformance by the Freedom Funds relative to the Freedom Index Funds is also directly related to the corresponding fee differential.  These higher fees, in conjunction with the Freedom Funds' poor performance, and excessive risk following the 2013/2014 strategy overhaul, render the Freedom Funds an imprudent investment alternative for the Plan.  *Id*. ¶¶ 64–65.

To the extent Defendants argue these funds are inappropriate comparators because they have "different aims, different risks, and different potential rewards that cater to different

investors," MOL at 18, they essentially suggest that investments cannot be compared to each other unless they are identical.  Of course, this is as nonsensical as it is unworkable: no two funds are exactly alike, and the point of benchmarking is to determine the funds in particular classes that are out- or underperforming their peers and/or the relevant market.  *See Miller*, 2020 WL 6479564, at \*4 ("this Court declines to rule on the reasonableness of comparing actively-managed funds to passively-managed index funds on a motion to dismiss.").  Two funds with the same exact strategy will, with the exception of different share classes, produce identical results.  For this reason, Courts have recognized there is no "blanket rule" that passively managed funds cannot be used as benchmarks for actively managed funds.  *LinkedIn*, 2021 WL 5331448, at \*7; *see also In re Quest Diagnostics Inc. ERISA Litig.*, 2021 WL 1783274, at \*4 (D.N.J. May 4, 2011) (refusing to dismiss complaint because plaintiffs used index funds to benchmark active funds).

Finally, in arguing the Freedom Funds outperformed the Freedom Index Funds, Defendants engage in the very sort of cherry-picking they accuse Plaintiffs of employing. Defendants present the most recent five- and 10-year returns (as of March 31, 2022) of the Freedom Funds and Freedom Index Funds, *see* MOL at 20, completely ignoring that such returns data was not yet recorded when Plaintiffs filed their original complaint, as well as the fact that other trailing returns data available to Defendants' during the Class Period reflect the Freedom Funds' underperformance.  *See PBGC*, 712 F.3d at 716 ("[w]e judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight") (quoting *In re Citigroup*, 662 F.3d at 140).[8]

---

[8] Defendants counter Plaintiffs' striking allegations regarding the $18 billion in outflows from the Freedom Funds by citing to the Freedom Funds's continued popularity as compared to the Index Suite.  MOL at 21 n.13.  But the more telling statistic is the significant number of industry

ii.      The Freedom Funds' Excessive Cost, Combined with Other Factors, Indicates Imprudence.

Defendants argue that ERISA does not require a fiduciary "to scour the market to find and offer the cheapest possible fund."  MOL at 22 (internal quotations omitted).  Yet Plaintiffs never take such an exaggerated position.  Instead, Plaintiffs simply allege that Defendants, in failing to consider the combination of risk of the Freedom Funds, consistent underperformance, excessive fees, and myriad other red flags throughout the Class Period, ignored warning after warning that the Freedom Funds was not suitable for the Plan.  *See Hughes*, 142 S. Ct. at 738 (noting "fiduciaries' continuing duty to monitor all plan investments and service arrangements and remove imprudent ones.").[9]

Indeed, unlike the cases Defendants cite, Plaintiffs do not ground their fiduciary breach claims solely in the costs of the investments in the Plan, MOL at 22, as considering cost in a vacuum goes against the "context-specific" inquiry ERISA requires.  *Hughes*, 142 S. Ct. at 738.  Rather, Plaintiffs' claims are rooted in Defendants' continued retention of the Freedom Funds following its underperformance, risk, and cost after the strategy overhaul in 2013 and 2014, and in light of the unsuitability of the funds for the Plan.  *See Biogen*, 2021 WL 3116331, at *6 ("Based on the Freedom suite's performance . . . following the 2013 and 2014 overhaul, the 2018

insiders and investors who have questioned the Freedom Funds's management and have recognized, as prudent fiduciaries should, that the excessive risk, cost, and consistent underperformance of the Freedom Funds has grown more apparent over the last decade.  The result has been the flight of substantial assets from the Freedom Funds: since the start of the Class Period, the Freedom Funds's market share has fallen from 15.4% in 2018 to 6.8% in 2021.  Indeed, even if the Freedom Funds continued to be popular with other investors, that does not excuse Defendant's ignorance of the Freedom Funds's significant red flags and underperformance during the Class Period.

[9] The great weight of decisions involving the Freedom Funds have found similar allegations to be sufficient at the pleadings stage.  *See, e.g.*, *Garthwait*, 2021 WL 4441939; *Quest*, 2021 WL 1783274; *Jones*, 2021 WL 1226551; *Biogen*, 2021 WL 3116331.

Reuters report, and reports from Morningstar, Defendants plausibly knew about the 'pitfalls' of the Freedom Funds . . . and did not meet the objective prudent person standard by continuing to offer said suite.") (internal citations omitted).

**B.    Plaintiffs' Allegations Regarding the Freedom Funds' Underlying Investments Are Well-Pled.**

Plaintiffs have pled detailed facts concerning the underperformance and/or insufficient track records of the Freedom Funds' underlying investments as of the start of the Class Period. AC ¶¶ 66-69.  Defendants contend that, because the underlying funds were not offered as standalone options in the Plan and were not plan assets under ERISA, allegations that Defendants failed to consider their underperformance does not support an inference of imprudence.  *See* MOL at 23.  But anyone with a passing familiarity of mutual funds (let alone the fiduciaries of a multibillion-dollar retirement plan) should have treated the underperformance and insufficient track records of the underlying funds as warnings of the shortcomings of the Freedom Funds.  Indeed, the performance of the Freedom Funds is entirely dependent on that of the underlying funds.  *See generally Biogen*, 2021 WL 3116331, at *5 ("To evaluate whether a fiduciary acted prudently, specific to a fiduciary's failure to remove or close a fund, the court must consider whether the fiduciary 'fail[ed] to investigate and evaluate the merits of [their] investment decisions.'") (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 424 (4th Cir. 2007)).

Defendants also argue Plaintiffs' position that many of the Freedom Funds' underlying funds lacked a sufficient track record is "baseless."  MOL at 23.  But all this argument proves is Defendants' lack of familiarity with industry standards.  A fund's age can indicate whether the manager has spent sufficient time developing and executing their strategy.  Prudent fiduciaries evaluate three- and five-year returns because these two metrics most closely approximate the

length of a market cycle.  AC ¶ 81 n.21; *Ramos v. Banner Health*, 461 F. Supp. 1067, 1097 (D. Colo. 2020) (noting that investment policy statements for retirement plans often require the evaluation of investment returns using three- and five-year benchmarks).  It is self-evident that fiduciaries should expect a fund to have been in operation for the longer of the two periods to ensure that a manager's strategy has been tested over a full market cycle.  In short, these allegations amount to one of many real-time warnings that prudent fiduciaries must adjust the Plan's investment offerings.  *See generally Cunningham v. Cornell Univ.*, 2019 WL 4735876, at *13 (S.D.N.Y. Sept. 27, 2019) ("*Cunningham II*") (finding an advisor satisfied fiduciary duty when it regularly presented "three and five-year benchmarks" of investment options).

Finally, Defendants misunderstand the underperformance allegations pertaining to the Freedom Funds' underlying funds.  While Defendants claim that underperformance "in one snapshot in time . . . says nothing about the prudence of the Freedom Funds or their performance *as a whole*," MOL at 24, Plaintiffs clearly state that the Intrinsic Opportunities Fund and the Russell 3000 Index, which together account for a staggering 15% of investor dollars in the 2040 through 2065 vintages, have significantly trailed their benchmarks *over their entire respective lifetimes.*  AC ¶ 66.

**C.    Plaintiffs' Comparisons to Other Target Date Funds Support Their Imprudence Claim Regarding the Freedom Funds.**

i.    The Alternative TDFs are Apt Comparators to the Freedom Funds.

Defendants take issue with Plaintiffs' comparison of the Freedom Funds to four of the largest non-Fidelity managers in the TDF marketplace.  MOL at 24.  Plaintiffs selected the non-Fidelity comparators because those four TDF suites represent the primary offerings of the Freedom Funds' top competitors (and therefore the alternatives most likely to be selected if fiduciaries appropriately determined to replace the Freedom Funds).  AC ¶ 80.  Information

regarding the performance of these alternative funds, which share an objective (*i.e.*, preparing investors for retirement at a particular date), was readily available to Plan fiduciaries throughout the Class Period.  *Id.*

Moreover, while there may be "scores of target-date funds available in the market," MOL at 25, the four proffered comparators and the Freedom Funds account for the majority of investor dollars in the TDF marketplace, rendering the comparisons far more meaningful than Defendants suggest.  The Court should not credit Defendants' attempts to mislead.  In fact, if Defendants' arguments against the Index Suite and alternative TDFs were to be taken seriously, there could apparently be no adequate TDF against which to benchmark the Freedom Funds.

        ii.        <u>Plaintiffs Allege Comprehensive Underperformance.</u>

Although Defendants mischaracterize Plaintiffs' allegations as pertaining to only a snapshot in time, Plaintiffs clearly allege that the Freedom Funds underperformed each of its most appropriate comparators.

Furthermore, in accusing Plaintiffs of "cherry picking" their performance allegations, Defendants conveniently ignore the detailed claims Plaintiffs include regarding the industry's and investors' loss of faith in the Freedom Funds.  *See* MOL at 25–27.  Indeed, Defendants fail to address the ***$16 billion*** in net outflows from the Freedom Funds between 2014 and 2018, a huge red flag that would have alerted prudent fiduciaries to the Freedom Funds' underperformance during the Class Period.  AC ¶ 78; *see Biogen*, 2021 WL 3116331, at *6 ("Based on the Freedom suite's performance on a trailing three- and five-year annualized basis following the 2013 and 2014 overhaul . . . [d]efendants plausibly knew about the 'pitfalls' of the Freedom Funds, given its publicity, and did not meet the objective prudent person standard by continuing to offer said suite."); *Quest*, 2021 WL 1783274, at *3 n.5 (finding plaintiffs'

allegations constituted a "real-time warning" to prudent fiduciaries): *MedStar*, 2021 WL 391701, at *6 (finding allegations of outflow of investment and criticism from financial news services sufficient to defeat a motion to dismiss).

Defendants attempt to minimize the Plaintiffs' returns data, which shows the Freedom Funds underperforming *every* comparator across *every* vintage by more than 1% annualized over both three- and five-year periods, stating that this difference is not substantial enough to infer an imprudent process.  MOL at 27.  As an initial matter, this represents a conscious effort to confuse, as Plaintiffs' performance figures are not cumulative, but annualized.  That Fund A underperformed Fund B by 1% on a five-year annualized basis means that, for the previous five years, investors in Fund B experienced an average return, compounded, of 1% less than Fund A *each year*.  AC at 80.  Moreover, the Freedom Funds' returns lagged those of at least one of Plaintiffs' comparators by nearly 3% on an *annualized* basis, clearly indicating a dramatic performance shortfall.  *Id.*

Defendants then engage in improper hindsight analysis, attempting to distract from the obvious indicators of their deficient process with the Freedom Funds' more recent positive performance (which is overstated and over a time period irrelevant to any proper evaluation of the Complaint).  *See* MOL at 27.  But this is flatly not the measure of prudence under ERISA. Rather, a fiduciary's actions are judged according to "information available . . . at the time of each investment decision," and courts focus on "a fiduciary's conduct in arriving at an investment decision, not on its results, and ask[] whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment."  *PBGC*, 712 F.3d at 716; *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996).  Moreover, the positive performance offered by Defendants is in relation to the Freedom Funds' custom benchmark,

26

which more appropriately gauges a TDF manager's ability to execute its strategy than its ability

to outperform the relevant market.  Further, this later positive performance does not negate the

multiple and significant red flags the Freedom Funds presented, and does not absolve

Defendants' failure to act in response to those warnings, during the relevant time.  *See Biogen*,

2021 WL 3116331, at *5 ("[W]hether a fiduciary's actions are prudent cannot be measured in

hindsight, whether this hindsight would accrue to the fiduciary's detriment or benefit."); *Fifth*

*Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) ("the content of the duty of prudence

turns on 'the circumstances . . . prevailing' at the time the fiduciary acts").

### III.    Plaintiffs Plausibly State an Imprudent Claim as to the Plan's Other Investments.

Courts have repeatedly found that specific allegations detailing the underperformance and

expense of certain plan investment options like those set forth in the Amended Complaint

support a reasonable inference that fiduciaries have deficient monitoring processes.  Defendants

attack these allegations as insufficient, MOL-AC at 6, but none of their arguments explain away

the stark quantitative and qualitative indicia of imprudence set forth in Plaintiffs' Amended

Complaint.

### A.    Plaintiffs Sufficiently Allege Underperformance.

Defendants again take issue with Plaintiffs' use of three- and five-year returns data,

despite the fact that these metrics are widely regarded by investment professionals and the

investment policy statements of competently managed defined contribution plans as the most

important metrics for evaluating whether investment options should be maintained in a plan

lineup.  *See Cunningham II*, 2019 WL 4735876, at *13 (advisor satisfied fiduciary duty by

regularly presenting "three and five-year benchmarks" of investment options); *Karg v.*

*Transamerica Corp.*, 2019 WL 3938471, at *7 (N.D. Iowa Aug. 20, 2019) (similar).  This data is

more than sufficient to support the inference that Defendants were imprudent in failing to timely remove these underperforming funds (and, in the case of the AMG Fund, in adding it to the Plan lineup at all). *See* MOL-AC at 4; *Falberg*, 2020 WL 3893285, at *9 ("Taken together, Plaintiff's allegations that the GS Funds underperformed and failed to warrant their elevated expense ratios as compared to similar funds sufficiently states a claim of imprudence."); *Sweda*, 923 F.3d at 331 (finding reasonable inference "that Penn's process of  selecting and managing options must have been flawed if Penn retained expensive underperformers over better performing, cheaper alternatives") (internal citations omitted).

Defendants attempt to excuse their malfeasance by pointing to a "long-range investment strategy," MOL-AC at 5, but there is no evidence of such a strategy, nor did the challenged investments give any indication that they would ever have the ability to outperform their benchmarks or their peers.  Instead, the information available to Defendants during the Class Period demonstrated nothing but the dismal track records of these funds and absence of any expectation of improved future performance.  *See* AC ¶¶ 83-106.  This underperformance was not short-term, but a consistent, worrying pattern of poor returns that would have prompted action from any prudent fiduciary appropriately monitoring Plan investments.  *See Disselkamp v. Norton Healthcare, Inc.*, 2019 WL 3536038, at *8 (W.D. Ky. Aug.  2, 2019) ("if a predictable investment continues to chronically underperform, one could draw a conclusion that the fiduciaries overseeing that fund have breached their duty").

Finally, isolated quarters of outperformance do not make up for consistent and significant trends of longer-term underperformance, and they do not justify the presence of an imprudent funds in a defined-contribution retirement plan.  *See* MOL-AC at 5-6.  Indeed, a fund's performance can only meaningfully be determined over a full market cycle.  *See, e.g.*,

Assembling a Robust Investment Policy Statement for Endowments and Foundations, THE PNC FINANCIAL SERVICES GROUP, INC., Jan. 8, 2020 (a "fund's investment performance should be reviewed regularly, such as on an annual basis; however, the emphasis with regard to performance should be focused on results achieved over a full market cycle (typically a three-to-five year period).").

  **B.**  **Plaintiffs Allege Appropriate Comparators**

  Again, it should first be noted that disputes over the propriety of benchmarks are too fact-intensive for resolution on a motion to dismiss.  *Cunningham*, 2017 WL 4358769, at *7.  Plaintiffs, however, directly responded to the deficiencies Defendants charged with respect to the Complaint, *see* MOL at 29, and took care in the Amended Complaint to allege multiple apt comparators for the challenged funds.  These new comparators include both actively and passively managed funds, directly addressing Defendants' previously avowed concerns.  *Id.*; *see* AC ¶ 87 (comparing the Parnassus Fund to the Jensen Quality Growth Fund and JP Morgan Equity Focus Funds, both actively managed U.S. large cap blend funds with superior returns); ¶¶ 91–92 (comparing the Invesco Fund to the Vanguard Russell 1000 Value Index Fund, a passively managed fund that tracks the Invesco Fund's benchmark, and the Columbia Dividend Income Fund and Parnassus Endeavor Fund, both actively managed domestic large cap value funds with superior returns); ¶ 95 (Comparing the AMG Fund to the passively managed Vanguard Mid-Cap Growth Index Fund and the Champlain Mid Cap Fund and ClearBridge Select Fund, both actively managed domestic mid cap growth funds with superior returns); ¶¶ 99–100 (comparing the Fidelity High Income Fund to the BlackRock High Yield Fund, a passively managed fund with superior returns, and the Fidelity Advisor High Income Advantage Fund and PGIM High Yield Fund, both actively managed high yield bond funds with superior

returns); ¶¶ 105-106 (comparing the Lazard Portfolio to the Fidelity Emerging Markets Index

Fund, a less expensive passively managed fund that tracks the Lazard Portfolio's index, and the

American Funds New World Fund and Fidelity Emerging Markets Fund, both actively managed

emerging market funds with superior returns).  Defendants provide absolutely no reasoning to

support their conclusory contention that these comparator funds are inappropriate.

Additionally, Defendants' claim that Plaintiffs "cherry-picked" the performance data for

the challenged funds could not be farther from the truth.  An investment's Morningstar rank is

but one metric for assessing performance, *see* MOL-AC at 6, and Plaintiffs provide

comprehensive returns data for each challenged investment throughout the entire class period.

AC ¶¶ 83–86 (tracking the underperformance of the Parnassus Fund from the third quarter of

2016 through the first quarter of 2019); ¶¶ 88–90 (tracking the underperformance of the Invesco

Fund from the fourth quarter of 2018 through the fourth quarter of 2021); ¶ 93 (tracking the

underperformance of the AMG Fund from the first quarter of 2015 through the third quarter of

2019); ¶¶ 96–97 (tracking the underperformance of the Fidelity High Income Fund from the

fourth quarter of 2013 through the fourth quarter of 2020); ¶¶ 101–04 (tracking the

underperformance of the Lazard Portfolio from the fourth quarter of 2015 through the fourth

quarter of 2021).  All of this returns data was available to Defendants in real time, and it should

have prompted to reconsider the place of these obviously imprudent funds in the Plan.  *Id.* ¶¶ 83,

91, 93, 96, 101; *see also Fifth Third Bancorp*, 573 U.S. at 425 (noting that the prudence inquiry

concerns "circumstances . . . prevailing at the time the fiduciary acts").  Accordingly, these

allegations are more than sufficient to support an inference of fiduciary breach.

In failing to appropriately monitor the Plan's investments, Defendants did not act with an

"eye single" to the interests of the Plan's participants and beneficiaries.  *Pegram*, 530 U.S. at

235.  Among other things, this is obviously not the kind of fiduciary management the Supreme Court had in mind when it recently emphasized that fiduciaries are not absolved of liability for selecting and retaining imprudent investment options by virtue of the presence of other potentially-suitable investments.  *See* MOL-AC, at 7-8; *see also Hughes*, 147 S. Ct. at 740.  In fact, the Court specified that courts evaluating ERISA breach of fiduciary duty claims must apply *Iqbal* and *Twombly* in a context-specific manner,[10] and that, under *Tibble*, ERISA imposes a continuing duty on fiduciaries to monitor all plan investments and service arrangements and remove imprudent ones.  *See id.* at 741.  This includes a duty to consider and respond to changed circumstances with respect to an investment.  *See id.*  As the Court bluntly explained, "[i]f the fiduciaries fail to remove an imprudent investment from the pan within a reasonable time, they breach their duty."  *Id.* at 742.  This is precisely what Plaintiffs claim occurred here.

## IV.   Plaintiffs Plausibly State an Imprudence Claim Regarding the Plan's Investment Menu as a Whole.

Defendants point out that ERISA does not mandate passive management, MOL at 33, but Plaintiffs never suggest it does.  But the gravamen of Plaintiffs' allegations concerning active management concern the additional risk, cost, and expectation of return of such investments.  As it relates to excessive costs, Plaintiffs claim Defendants breached their duty to appropriately monitor the costs borne by participants and beneficiaries.  *See Tibble*, 843 F.3d at 1198 (noting the fiduciary obligation to "minimize costs.").  Because this fee burden is passed on to participants, it is essential that that fiduciaries benchmark these costs and act to reduce them

---

[10] Circuit courts are already taking heed of the Supreme Court's guidance.  In fact, earlier this month, at oral argument in an appeal of an order dismissing a similar action, Judge Easterbrook of the Seventh Circuit commented, "I read *Hughes* as saying that complaints like this cannot be dismissed on the pleadings."  *Albert v. Oshkosh Corp.*, 21-2789 (7th Cir.) (oral argument).  It is worth noting the Amended Complaint sets forth even more robust allegations concerning comparators and red flags here than the pleading at issue in *Oshkosh*.

wherever possible.  *See* 29 U.S.C. § 1104(a)(1) (requiring fiduciaries to act "solely in the interest of the participants and beneficiaries" of a plan).

Further, even crediting Defendants' gripe that the figures set forth by Plaintiffs fail to account for the investment management fees rebated back to the Plan, there is no question that the Plan pays investment-related fees far greater than the average TPC for plans with more than $1 billion in assets.  *See* AC ¶ 107.  While the accurate amount of overpayment participants suffered because of the Plans exorbitant expenses cannot be determined with precision absent discovery, for the purposes of the Motion, Plaintiffs' allegations are sufficient.  Indeed, in latching on to this omission, Defendants sidestep the more pertinent argument that they failed to negotiate lower recordkeeping fees and that the Plan's "bundled" arrangement detrimentally affected participants, regardless of any rebates.  Defendants do not even attempt to counter Plaintiffs' sound allegation that, considering the size of the plan and corresponding heightened bargaining power, they should have negotiated lower recordkeeping fees.  *Id.* ¶¶ 4, 107.

**V.      Plaintiffs Plausibly State a Claim for Breach of the Duty of Loyalty.**

Contrary to Defendants' arguments, the Complaint alleges Defendants' actions are inconsistent with the undivided loyalty they owe to the interests of Plan participants.  ERISA's duty of loyalty requires fiduciaries to act "solely in the interest of the participants and beneficiaries," and "for the exclusive purpose of providing benefits to participants and their beneficiaries."  *See* ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).  This duty requires fiduciaries to act with an "eye single" and "complete loyalty" to the interests of participants. *Pegram*, 530 U.S. at 235.  Defendants' actions, which favored its service providers, such as Fidelity, over the Plan participants, are inconsistent with that duty.

Plaintiffs allege Defendants selected high-cost investments in order to use a portion of the fees to pay Fidelity its inflated fees.  These action strongly support the inference that Defendants' actions were taken: (1) to save itself costs at the expense of Plan participants; or (2) to favor its recordkeepers over the Plan participants.  *See Johnson v. Providence Health & Servs.*, 2018 WL 1427421, at *9 (W.D. Wash. Mar. 22, 2018) ("While the complaint provides no direct evidence of self-dealing or preferential treatment for Fidelity, the inclusion and retention of various Fidelity investment products is circumstantial evidence that Defendants did not act "with an eye single toward beneficiaries' interests").  Moreover, courts across the country have routinely declined to dismiss disloyalty claims where the factual allegations are, as here, tied to the prudence claims because discovery of the shared facts would resolve both claims.  *See*, *e.g.*, *Pinnell*, 2020 WL 1531870, at *6; *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 474-80 (M.D.N.C. 2015); *Morin v. Essentia Health*, 2017 WL 4876281, at *1 (D. Minn. Oct. 27, 2017) (citing *Tussey v.  ABB, Inc.*, 746 F.3d 327, 335 (8th Cir. 2014)); *see also Abraha v. Colonial Parking, Inc.*, 243 F. Supp. 3d 179, 188 (D.D.C. 2017) (holding excessive fee allegations sufficient to state a claim for breach of the duties of loyalty and prudence).

Moreover, these determinations are best suited for a decision on a more developed record.  *See, e.g.*, *Henderson*, 252 F. Supp. 3d at 1356 ("Whether the [p]lans' fiduciaries intended to benefit TIAA, Fidelity, and Vanguard is an issue than can be better determined at the motion for summary judgment stage."); *Braden*, 588 F.3d at 598 (noting plaintiffs cannot be penalized for lacking information tending systematically to be in the sole possession of defendants).

## VI.    Plaintiffs' Derivative and Alternative Claims Succeed.

Defendants argue that Counts II and III, in which Plaintiffs respectively set forth failure

to monitor and alternative participation claims, fail because they are derivative of Plaintiffs'

underlying fiduciary breach claims and because Plaintiffs fail to allege facts about Defendants

actual monitoring process.  MOL at 34-35.  These arguments, however, entirely fail to engage

with the pled facts and provide no basis whatsoever to dismiss Plaintiffs' failure to monitor and

alternative participation claims.  Indeed, because Plaintiffs have adequately alleged underlying

claims of fiduciary breach, their failure to monitor and alternative participation claims must

succeed.  *See, e.g.*, *Falberg*, 2020 WL 3893285, at *15 (sustaining monitoring claims in

conjunction with underlying fiduciary breach claims) (collective cases).

   ***Derivative Claims.***  Because Plaintiffs have pled plausible underlying claims, Plaintiffs

have sufficiently alleged their derivative claims.  In *Cunningham v. Cornell Univ.*, the Southern

District of New York held that the plaintiffs' allegations that the defendants "breached their

fiduciary duties by, among other things, failing to monitor their appointees, including the

Committees and their members, failing to have a system in place to monitor the appointees'

performance, and failing to remove appointees whose performance was inadequate" were

adequate to defeat defendants' motion to dismiss.  2018 WL 4279466 at * 4.  Plaintiffs'

Complaint contains similar factual allegations, and therefore is sufficient.  Simply put, Plaintiffs

adequately pled failure to monitor co-fiduciaries and alternatively, non-fiduciary liability.  *See*

*Biogen*, 2021 WL 3116331 at *10.

   First, as discussed at length above, Plaintiffs have alleged a number of underlying

breaches.  *Supra*, Sections I-IV.  Second, the allegations in the Amended Complaint outline the

roles and responsibilities of Defendants, as well as Defendants' glaring omissions, and are more

than sufficient to provide a basis for relief.  Specifically, Plaintiffs allege that YNHH, which had

the authority to appoint and remove the fiduciaries of the Plan, breached that duty by failing to

prevent, or at least mitigate, the losses caused by the underlying breaches set forth in Count I. AC ¶¶ 134–37, 139.  Plaintiffs further allege that YNHH's breach of its duty to monitor is apparent from its failure to remove or take any other remedial action against the fiduciaries, despite their breaches.  *Id.* ¶ 138.  Such allegations are sufficient under the relevant pleading standard.  *See Cunningham*, 2017 WL 4358769, at *11; *In re M&T Bank Corp. ERISA Litig.*, 2018 WL 4334807, at *11 (W.D.N.Y. Sept. 11, 2018) (rejecting the argument that a failure to monitor claim failed for lack of supporting factual allegations because "the appropriate ERISA mandated monitoring procedures vary according to the nature of the plan at issue and other facts and circumstances, [so] an analysis of the precise contours of the defendants' duty to monitor at this stage is premature") (citations omitted).  Where, as here, "[p]laintiff has plead 'facts,' including allegations of excessive fees paid by the Plan, that 'indirectly show[ ] unlawful behavior,'" Defendants have the requisite "fair notice of what the claim is and the grounds upon which it rests."  *Id.* (citations omitted).

**Alternative Claims.**  As it relates to Count III, Plaintiffs are permitted to plead alternative claims under Rule 8(d)(2) and do so here in the event any of the Defendants, who have not answered the Amended Complaint, attempt to disclaim fiduciary responsibility.  *See* Fed. R. Civ. P. 8(d)(2).  Specifically, Plaintiffs plead that if any Defendants are not deemed to be fiduciaries or deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are still liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of imprudent investment options and pay excessive recordkeeping and administrative fees, all of which was unjustifiable in light of the size and characteristics of the Plan.  AC ¶ 144.  Given the roles and relationships

of the Defendants identified in the Amended Complaint, AC ¶¶ 11-13, it should be an obvious

inference that each Defendant knew or should have known of the nonfeasance or malfeasance of

the others.  *See, e.g.*, *In re Sprint Corp. ERISA Litig.*, 2004 WL 2182186, at *4 (D. Kan. Sept. 24,

2004) ("the court has no difficulty concluding that the allegations contained in plaintiffs' newly

asserted co-fiduciary Claim IV adequately state a claim against the director defendants").  Thus,

dismissal of the claim at this juncture would be premature.

### VII. Plaintiffs Plausibly Allege that the Board, Individual Board Members, and Individual Committee Members are Fiduciaries.

Defendants argue this Court should dismiss the Board, the individual members of the

Board ("Individual Board Members"), and the individual members of the Committees

("Individual Committee Members") as Defendants with little coherent explanation.  MOL at 3,

36.  True, Plaintiffs must allege that Defendants were each fiduciaries of the Plan; but the

Complaint sets forth plausible allegations that Defendants were named or functional fiduciaries

of the Plan with potential liability for the ERISA violations at issue.  ERISA imposes

responsibilities on both named and functional or *de facto* fiduciaries.  *See Coulter v Morgan*

*Stanley & Co. Inc.,* 753 F3d 361 (2d Cir. 2014) (a person is a *de facto* fiduciary to the extent she

(a) "exercises any discretionary authority or discretionary control respecting management of

such plan or exercises any authority or control respecting management or disposition of its

assets," or (b) "has any discretionary authority or discretionary responsibility in the

administration of such plan."); *see also In re Morgan Stanley ERISA Litig.*, 696 F Supp 2d 345

(S.D.N.Y. 2009) (finding plaintiffs' allegations that corporate entity approved the funding of

employer contributions to the plan in question is sufficient to establish its status as a *de facto*

fiduciary).

Plaintiffs plausibly allege that the Board appointed "authorized representatives" of Yale-

NH Hospital, including Administrative Committees, as plan fiduciaries.  Defendants concede the

Board's appointment and removal authority gives rise to fiduciary responsibility with respect to

those functions, of which monitoring fiduciaries is an obvious component.  *See* MOL at 37.

Defendants' convoluted argument that the Individual Board Members should be dismissed

because they cannot unilaterally act on behalf of the Board is unsupported and, in any event,

beside the point.  *See id.* (citing Conn. Gen. Stat. Ann. § 33-1100).  Defendants point to no

authority suggesting plaintiffs must plead that the Individual Board Members had authority to act

on behalf of the Board.  This is with good reason, as there is no record evidence at this stage

concerning the Board's governance practices, voting procedures, or attendance at meetings to

contradict Plaintiffs' allegations of the Individual Board Members' direct involvement with and

responsibility for appointing and removing other fiduciaries.

Likewise, Plaintiffs plausibly allege the Individual Committee Members acted with

discretionary authority over Plan assets by virtue of their roles on the Committees.  As explained

above, Plaintiffs do not have access to internal documents reflecting the Committees'

governance practices or attendance that would illuminate the roles of the Individual Committee

Members vis-à-vis the Plan.  *See PBGC*, 712 F.3d at 718.  Thus, Plaintiffs' circumstantial

allegations of the Individual Committee Members' conduct is sufficient at this stage.  Defendants

hyperbolically characterize Plaintiffs' allegations as seeking to impose "strict liability" on

individuals who serve in fiduciary capacities.  MOL at 38.  This is untrue.  Plaintiffs' allegations

of fiduciary status is based on the Individual Committee Members' discretion and control over

Plan management and assets.  In addition, the issue in Defendants' principal authority was

decided at the summary judgment stage with facts in the record that refuted the individual

defendant's authority over plan assets and management.  *See Dardaganis v. Grace Cap. Inc.*, 889

F.2d 1237, 1242 (2d Cir. 1989).

It would, accordingly, be premature to dismiss the Board, Individual Board Members, and Individual Committee Members from the action.

### VIII.   Plaintiffs Have Standing to Challenge All Funds

Finally, mistaking and misstating facts and law, Defendants argue that Plaintiffs lack standing to challenge Plan investment alternatives in which they did not personally invest.  Since Defendants filed the Motion, the Third Circuit confirmed what, despite Defendants' quibble, the majority of Courts considering the issue have found: plaintiffs in ERISA breach of fiduciary duty actions who allege loss with respect to their Plan investments have standing to challenge other Plan investment alternatives.  *See Boley v. Universal Health Servs., Inc.*, ___ F. 4th ___, 2022 WL 1768984, at *3-*5 (3d Cir. June 1, 2022).  Defendants do not dispute that the elements of Article III standing are satisfied with respect to the funds in which Plaintiffs invested, or Plaintiffs' other claims.  MOL at 39.  Accordingly, this straightforward analysis is satisfied.

Courts across the country, operating with this understanding, have recognized, "[a]lthough in certain types of matters, courts have found that a plaintiff cannot suffer an injury from an investment that he or she did not purchase, 'courts have declined to apply the above bright-line rule when addressing ERISA claims for breach of fiduciary duties.'"  *Hay v. Gucci Am., Inc.*, 2018 WL 4815558, at *4 (D.N.J. Oct. 3, 2018) (citing *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 2016 WL 4507117, at *4 (C.D. Cal. Aug. 5, 2016)); *see also Cassell v. Vanderbilt Univ.*, 2018 WL 5264640, at *2-*3 (M.D. Tenn. Oct. 23, 2018) (finding plaintiffs had standing to challenge funds in which they did not invest).[11]

---

[11] Defendants' authorities represent a minority approach and are otherwise inapposite.  *See Falberg v. Goldman Sachs Group, Inc.*, 2020 WL 3893285, at *8 (S.D.N.Y. July 9, 2020) ("[*Patterson v. Morgan Stanley*, 2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019)] is an outlier; the

Indeed, another court in this District recently found that plaintiffs do not need to invest in all of the funds challenged by the complaint in order to establish standing. *See Garthwait v. Eversource Energy Co.*, 2022 WL 1657469, at *8-*9 (D. Conn. May 25, 2022) ("To the extent that the defendants argue that none of the plaintiffs ever invested in four of the challenged funds within the actively-managed Freedom Fund suite . . . does not deprive the named plaintiffs of standing as to these funds"). The *Garthwait* court also correctly recognized the derivative nature of the plaintiffs' claims on behalf of the plan supported a finding of standing. *See id.* (citing *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142, n. 9 (1985)).

Defendants' argument that Plaintiffs somehow lack standing is contrary to the great weight of authority and, contrary to the purposes of ERISA's remedial scheme, would cabin appropriate recourse when fiduciaries breach duties owed to a plan.

## CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' Motion in its entirety.

Dated: June 10, 2022                                    Respectfully submitted,

                                                        */s/ Laurie Rubinow*
                                                        James E. Miller
                                                        Laurie Rubinow
                                                        MILLER SHAH LLP
                                                        65 Main Street
                                                        Chester, CT 06412
                                                        Telephone: (866) 540-5505
                                                        Facsimile: (866) 300-7367
                                                        Email: jemiller@millershah.com
                                                                   lrubinow@millershah.com

---

majority of courts considering similar cases both in this district and elsewhere are consistent with *Leber IV*).

James C. Shah
Alec J. Berin
MILLER SHAH LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
        ajberin@millershah.com

Kolin C. Tang
MILLER SHAH LLP
19712 MacArthur Blvd.
Irvine, CA 92612
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: kctang@millershah.com


Anna K. D'Agostino
MILLER SHAH LLP
225 Broadway, Suite 1830
New York, NY 10007
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: akdagostino@millershah.com


Mark K. Gyandoh
Gabrielle P. Kelerchian
CAPOZZI ADLER, P.C.
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-0200
Facsimile: (717) 233-4103
Email: markg@capozziadler.com
        gabriellek@capozziadler.com


Donald R. Reavey
CAPOZZI ADLER, P.C.
2933 North Front Street
Harrisburg, PA 17110
Telephone: (717) 233-4101
Facsimile: (717) 233-4103
Email: donr@capozziadler.com


*Attorneys for Plaintiffs, the Plan,
and the Proposed Class*

40